CORNISH *v.* JOHNS.

Opinion delivered February 11, 1905.

1. FRAUD—MISREPRESENTATION—OPPORTUNITY OF KNOWLEDGE.—A purchase by an heir of the interests of coheirs will not be set aside merely because he underestimated to them the value of the estate, if they had as good opportunity as he to ascertain the value of the property. (Page 236.)

2. MISREPRESENTATION—MATTER OF LAW.—While the general rule is that a misrepresentation as to matters of law will not afford ground for relief, yet when one who has superior means of information professes a knowledge of the law, and thereby obtains an unconscionable advantage of another, who is ignorant and has not been in a situation to become informed, the injured party is entitled to relief as well as if the misrepresentation had been concerning matters of fact.   (Page 237.)

3. SAME—REMEDY.—Where an heir purchased the interests of certain coheirs in the ancestral estate for a less sum than they would otherwise have sold them by representing to them that they were liable for a certain debt, when, in fact, they were not liable therefor, they being ignorant and reposing confidence in the purchaser's superior knowledge, he will be required to refund to them an amount equivalent to the debt which they by mistake assumed.   (Page 239.)

4. TRUST—PURCHASE BY TRUSTEES OF BENEFICIARY'S INTEREST.—A purchase
   by an administrator of the interests of certain minor heirs will not
   be upheld unless it clearly appears that such heirs were fully informed
   in regard to the value of the property, and the nature of their
   interests in it; and if it appears that he made false representations
   to them, the sale will either be set aside, or, if their interests be
   relatively small, he may be required to make good to them the full
   value of the property purchased.  (Page 240.)

Appeal from Drew Chancery Court.

MARCUS L. HAWKINS, Chancellor.

Reversed.

### STATEMENT BY THE COURT.

Joseph Johns died in Drew County, Arkansas, June 18, 1900, leaving surviving him a widow, Harriet E. Johns, a son, W. H. Johns, two daughters, Julia A. Hines and Mary F. Yates, and ten grandchildren, the descendants of his son, J. A. Johns, who had died before his father.  The estate of Joseph Johns consisted of lands valued at $1,900, promissory notes to the amount of $15,000, and $2,000 or more in cash.  He was a very old man at the time of his death, could neither read nor write, and had been blind for a year or two; and his wife transacted most of his business for him.  She was his second wife, and was not the mother of either of his children, and at the time of her husband's death was over 70 years old.  Besides $2,000 which had been deposited in bank, there was certain other money which was claimed by Mrs. Johns as her own money, most of which she claimed had been given her by her husband.  Two thousand dollars of this money was in currency, and for some time previous to the death of Johns had been kept by him and his wife concealed in the house, part of the time under the carpet and part of the time sewed up in the bed upon which he slept, and was there at the time of his death.  There was at the time of his death some $1,700 or $1,800 more in gold and silver buried in the dairy, but which Mrs. Johns also claimed, but all of this money, except $300, was afterwards stolen, so she claimed.

Joseph Johns left a will which had been executed some sixteen years before his death.  At the time this will was executed, he had four children living, his son, J. A., not being dead at that

time, and the will gave all the property to his wife during her life with remainder to his four children and his granddaughter, Sarah J. Cornish, to be divided share and share alike. The provision in respect to his granddaughter had at his death been erased by having a line from a pen drawn over it. There was also a bequest of $1,000 to his great grandson, Ed Cornish, for the purpose of educating him; but Ed Cornish at the time of Johns' death was 30 years of age, and had already received his education from means furnished by the deceased Johns.

Soon after the death of Johns Ed Cornish purchased the interests of the three surviving children of Joseph Johns in the estate of their father. He first bought the interest of W. H. Johns, and paid him therefor $1,400 in cash. He next bought the interest of Mrs. Hines, who was his grandmother, and paid her $1,200 in cash and $2,000 which she owed the estate. He then bought the interest of Mrs. Yates, paying her $900 in cash and $250 in notes which she owed the estate, and afterwards conveying her land valued at $450, which belonged to the estate. He next bought the interest of the five adult children of J. A. Johns, deceased, paying them therefor $65 each. The deed from these heirs was executed on the 25th day of July, 1900, and on the same day Cornish took out letters of administration on the estate of Joseph Johns, and formally took charge of the estate. The will of Joseph Johns appointed J. A. Johns, Joseph A. Hearn and J. A. Thompson, executors of his estate. But J. A. Johns died before his father, and the remaining two, after Cornish had bought out all the adult heirs of the estate, at the request of Cornish, declined to serve, and, as before stated, he was appointed administrator. On the 8th day of October, 1900, th eprobate court Bradley County made an order authorizing Evaline Johns, the mother and guardian of the minor children of J. A. Johns, deceased, to sell the interests of said children in the estate of Joseph Johns, their grandfather, to Ed Cornish for $65 each, and afterwards in March, 1901, the guardian conveyed the interests of said minors to Cornish for the consideration of $325 in cash, being $65 for each of said five minors. In the month of October, 1900, Mrs. Harriet Johns declined to take under the will, and claimed a dower interest in the estate, which was granted by the probate court. On the 5th of November, 1900, Cornish transferred to Mrs. Johns, the widow of Joseph Johns, a half interest

in the estate for the consideration of $2,000 in cash and her agreement to relinquish her claim of dower in the estate, and to accept instead the property conveyed by the deed.

Afterwards on the 6th day of September, 1901, the heirs of Joseph Johns, deceased, filed a complaint in equity against Cornish and Mrs. Johns, the widow of Joseph Johns, alleging that the defendants had, soon after the death of Joseph Johns, taken possession of the estate left by him, and conspired together for the purpose of procuring the interests of plaintiffs in the estate for less than the value of said interests. That said defendants, having full knowledge of the assets of the estate and the balance thereof, took charge of the same, and, by misrepresenting the value thereof, deceived and misled plaintiffs, and fraudulently induced them to part with their respective interests at a sum far less than its real value. The plaintiffs were without any knowledge of the facts, and relied entirely upon the representations of the defendants in reference to the amount and value of the assets of the estate and the value of their respective interests, and were overreached and misled by such representations. Wherefore they asked that said deed be set aside, and defendant be required to account for the assets of the estate.

The defendants appeared, and answered. They denied the allegations of conspiracy, fraud and misrepresentations, and alleged that the plaintiffs relied on their own knowledge of the estate, and sold because they were convinced that it was to their interest to do so. Wherefore they asked that the bill be dismissed.

On the hearing the chancellor found: "that the defendant Ed Cornish became an intermeddler with the assets of the estate of Joseph Johns, deceased, and took upon himself a fiduciary relationship towards the heirs of said estate; that he took advantage of his knowledge of the status and affairs of said estate and the ignorance of said heirs; that he paid an inadequate consideration to the plaintiffs for their interests in the estate, and that the several deeds from the heirs to him should be set aside and cancelled." He thereupon entered a decree in favor of plaintiffs, from which defendants appealed.

*Blackwood & Williams,* for appellants.

A family agreement entered into upon the supposition of a right is binding. 36 Ga. 191; 9 S. & R. 276; 6 Watts, 48; 5

Wheat. 226; 6 Pa. St. 228; 52 Pa. St. 370; 105 Pa. St. 31; 105 *Ib.*
121; 172 *Ib.* 104; 17 R. I. 406; 32 S. C. 262; 1 Head, 573; 7
Heisk, 235; 10 Lea, 421; 91 Am. Dec. 761; 50 Mo. App. 1;
Story, Eq. Jur. § 131; 4 Ves. 840; 1 Atk. 10; Bisph. Eq. § 189.
Schoul, Dom. Rel. § 271; 11 Am. Dec. 729; 11 Gray, 506;
The adequacy of the consideration will not be questioned.
36 Ga. 191; 1 Head, 564; 55 Vt. 391; 17 Am. Dec. 124; 24 Ga.
402; 21 N. C. 182; 105 N. C. 121; 17 R. I. 406; 15 Beav. 300;
36 Ga. 184.　The compromise is conclusive on plaintiffs.　26 Am.
Dec. 52; 99 *Ib.* 492; 57 Ala. 267; 21 Ill. App. 258; 46 Mich. 173;
14 Vt. 410; 132 U. S. 318; 44 N. W. 959; 35 Mo. App. 426; 66
U. S. 80.　A mistake of fact will not avoid the agreement.　2 So.
426; 12 Ga. 121; 12 Ky. 637; 34 Mo. 477; 12 Vt. 377; 32 Ala.
415; 36 Kan. 697; 20 Am. St. Rep. 239.　If fraud had been
proved, there could have been no recovery.　1 N. E. 146; 64 Am.
Dec. 467; 16 Am. St. 330; 5 N. E. 799; 29 *Ib.* 123; 83 N. Y. 300.
43 Am. Dec. 651.　Settlement without an administration is favored
in law.　52 Pa. St. 370.　A party seeking to rescind for fraudu-
lent misrepresentation must act promptly before the rights of third
parties become vested.　14 Barb. 597; 17 *Ib.* 429; 27 *Ib.* 654; 54
N. Y. 415; 7 Daly, 408.

*Wells, Williamson & Cotham,* for appellees.

The appellant is not protected by the doctrine of family set-
tlements.　If one intermeddles, and qualifies as administrator, his
letters relate back and legalize his previous acts.　38 Ark. 636;
49 Ark. 468; 1 Perry, Tr. § 245; 2 Story, Eq. Jur. 1255; 2 Pom.
Eq. Jur. 1053; 9 S. W. 713; 81 N. Y. 308; Bisp. Pr. Eq. § § 238,
93; 1 Perry, Trusts, § 210.　The burden is upon appellant to
prove adequacy of consideration.　Bisp. Pr. Eq. § 220; Perry,
Trusts, § 194; Kerr, Fraud, 151; 41 Ark. 269; Bump, Fr. Con.
583; Perry, Trusts, § 201.　A gift *inter vivos* must be completely
executed.　8 Am. & Eng. Enc. Law, 1313; 43 Ark. 318.　Gifts
from deceased husband to wife must be clearly proved; the pre-
sumptions are against a gift.　Rice, Ev. 989.　Mrs. Johns' testi-
mony concerning any communications made by her husband was
incompetent.　Sand. & H. Dig. § 2915; 43 Ark. 314; 9 Am. &
Eng. Enc. Law, 807; 29 *Ib.* 628; 33 Ark. 774; 19 Am. & Eng.
Enc. Law, 131.　The defense of a former suit pending, to be
available, must be pleaded.　27 Ark. 315; 8 Am. & Eng. Enc.

Law, 549. There can be no appeal from an *ex parte* order. 2 Enc. Pl. & Pr. 96.

RIDDICK, J., (after stating the facts.) This is an appeal from a decree rendered in favor of the heirs of Joseph Johns, deceased, in an action by them against Ed Cornish and Harriet E. Johns, the widow of Joseph Johns, deceased, setting aside certain deeds executed by the heirs to Ed Cornish and charging Mrs. Johns with certain money which she claimed in her undivided right, but which the chancellor found to be the funds of the estate.

A consideration of the evidence convinces us that the allegation that Cornish by misrepresentation and fraud induced W. H. Johns and his two sisters to convey their interests in the estate of their father to him cannot be sustained. The proposition to sell came first from W. H. Johns. He offered to sell his interest to the widow of Joseph Johns for $1,500. She declined to purchase, but told him that Cornish might buy his interest, and W. H. Johns then offered to sell to Cornish, and after some discussion, and after Johns had made an examination of the assets of the estate, he sold his interest to Cornish for $1,400. W. H. Johns lived in Louisiana, and said at the time of the sale that he sold his interest for less than its value "to avoid the trouble and delay in going back and forth to court." He admitted that Cornish and others informed him that the assets of the estate were worth about $1,800, and that he made the sale on that basis. That Cornish acted in good faith in making this representation is apparent from the statement of the assets of the estate contained in the brief of counsel for the heirs. The statement shows that the total value of all the assets of the estate amount to $23,313,27, but the estimate includes $2,000 "cash in bed tick" and $1,800 "gold and silver buried," and the evidence shows very conclusively that Cornish had no more knowledge of these two items than the plaintiffs. This money was claimed by Mrs. Johns, the widow, as her individual property; and, although Cornish bought out the interest of the heirs, and was appointed administrator of the estate, he never made any claim to it, nor received any benefit from it, unless it be that he did so by borrowing a part of it from Mrs. Johns. He afterwards accounted to her for this money, which she loaned him as her own. The evidence does not show that this money belongs to the estate; but, if it did, Cornish had

no knowledge of the fact at the time he purchased, and he cannot be blamed for not giving information that he did not possess. If, then, we deduct from the assets claimed by plaintiff these two items of "money buried" and "money concealed in a bed tick," we have, as the amount of the assets of which Cornish had knowledge at the time he purchased, the sum of $19,425.25. But this estimate includes at their face value promissory notes to the amount of $15,523.27, and it was shown that some of these notes were barred by the statute of limitations and probably worthless. The evidence shows that over $1,000 should be deducted from this account, which would leave the actual value of the assets very near the amount as stated by Cornish.

It is true that Cornish made some profit in the purchase of the interests of these heirs in their father's estate, for, if the estate was worth $18,000, then, after deducting one-third for the widow, each of the four shares was worth about $3,000, whereas he bought them for about $1,400 each. But if the estate had been wound up by the ordinary course of administration, the fees of the executor and other costs incident to the collection of the debts due the estate would have been taken from the assets, and should be deducted in order to ascertain the actual value of these shares. These plaintiffs avoided the delay, the risk and uncertainty of the future by selling their interests for a cash consideration. If they sold for less than actual value, they must bear the loss, for it is not shown that they were misled by the defendants.

Some complaint is made that Cornish took charge of the will of Joseph Johns; but it is not shown that he did so for a fraudulent purpose, or that he concealed from the heirs any provision of the will. On the contrary, one of the plaintiffs, a son of J. A. Johns and grandson of Joseph Johns, testified that Cornish read the will to him, and informed him that he (Cornish) did not claim the $1,000 bequeathed to him by the will to enable him to educate himself, stating that he had already received his education during the life of Joseph Johns. Cornish also told him that under the will the widow was entitled to a life estate in the property, but informed him that she had agreed to waive that provision of the will, and claim only a dower interest. He did this before he purchased the interest of the witness, which shows that Cornish did not keep secret the provisions of the will or mislead the heirs in reference thereto. If Cornish to some extent underestimated the

value of the assets of the estate which he was trying to buy, it furnishes no ground for setting aside the sale to him, for plaintiffs had the same opportunity that he had to ascertain what was the true value of the property, and his action in that regard was nothing more than a seller might expect of a purchaser under such circumstances. "The law," says Mr. Bishop, "departing from the rule of morals, tolerates a good deal of lying in trade, when in the nature of merely puffing one's own goods or depreciating those of another; provided the thing bargained about reveals its own qualities, and is open to the parties' equal inspection." Bishop on Contracts (enlarged ed.), § 664; *Hill* v. *Bush,* 19 Ark. 522; *Fitzhugh* v. *Davis,* 46 *Ib.* 337.

It is true that one of these parties from whom Cornish purchased was his grandmother. Now, as a matter of ethics and good manners, it is doubtful whether, if one gets the best of a bargain made with his grandmother, he should retain the advantage against her consent. But with the law it is different, when no unfair means are used; and the evidence does not show that Cornish made any misrepresentation or acted unfairly toward this plaintiff. She desired to sell her interest in the estate of her father, and he, being willing to buy, simply told her what price he would pay, and allowed her to decide for herself whether she would sell or not, without any persuasion on his part. In fact, it does not appear that Cornish used any unfair means to induce either W. H. Johns or his two sisters to sell their interests in the estate, and, after a consideration of the evidence, we feel convinced that they have made out no case, and that the complaint as to them should be dismissed for want of equity.

With regard to the purchase from the heirs of J. A. Johns, the case is somewhat different. There were ten of these heirs, and Cornish purchased their interests in the estate of their grandfather for $65 each, making $650 for the one-fourth interest which they together owned in that estate subject to the widow's dower and homestead, whereas he paid the other three shareholders about $1,400 or $1,500 each for their interest.

The purchase from the heirs of J. A. Johns was secured at that reduced price in this way: J. A. Johns was at the time of his death in debt to his father, Joseph Johns, about $850, though the debt was barred by the statute of limitations. The evidence shows that J. A. Johns left only a small estate, which was retained

by the widow and minor children, and the adult heirs received none of it. As J. A. Johns died before his father, and as the debt to his father was barred by statute of limitations at the time of his death, it is evident that neither the estate nor the heirs of J. A. Johns was liable for this debt. But the heirs of J. A. Johns, being persons of limited business experience, did not know that they were not liable for the debt of their father, and, relying upon the representations of Cornish and his attorney that they were liable for such debt, they were induced to sell their interests in their grandfather's estate at a price much below its actual value, in order to obtain a release from that debt. Cornish may have been, and probably was, acting in good faith in making this representation. But, however honest he may have been, he assumed to know the law, and undertook to advise these heirs as to their rights and liabilities in reference to this property. He knew that they were persons of limited knowledge and experience, and that they were taking as true the assumption on his part that he knew the law, and were reposing confidence in him that he would not mislead them in reference thereto. He was their kinsman, and was not only a man of more education and business experience, but had consulted attorneys about the matter; so that it was only natural that they should suppose that he knew what he was talking about when he assumed to advise them in reference to their rights in respect to his property. They acted upon his representations, and were misled, and under the circumstances we do not think he should be allowed to make a profit out of his misrepresentations, whether intentional or not.

While a representation in regard to the law is generally looked upon merely as an opinion, not binding on the party making it, still there are exceptions to this rule; and "when one who has had superior means of information professes a knowledge of the law, and thereby obtains an unconscionable advantage of another, who is ignorant, and has not been in a situation to become informed, the injured party is entitled to relief as well as if the misrepresentation had been concerning matters of fact." 1 Bigelow on Fraud, 488; *Peter* v. *Wright,* 6 Ind. 183.

But for this misrepresentation of Cornish and his attorney these heirs would have no doubt demanded a much larger price. To the extent that they were injured by this misrepresentation, we

think the finding and decree of the chancellor should be sustained. . But it is evident that the adult heirs were only injured to the extent that the assertion against them of this claim against their father reduced the amount of cash paid them. As there were ten of the heirs, and the debt against the estate of their father was only $850, none of them was injured by this misrepresentation more than one-tenth of that sum, towit, $85. When the five adult heirs are each paid this sum with interest, they will have no further ground of complaint.

As to the five minor children of J. A. Johns, who acted through their guardian, Cornish did not purchase their interest in the estate until after he had been appointed administrator of the estate of Joseph Johns, their, grandfather. The estate owed no debts, and he had possession of their share of the estate as administrator, and stood towards them in the position of a trustee. Now, while the law does not absolutely prohibit a trustee in such a case from purchasing from a beneficiary, yet equity looks with disfavor upon such transactions, and, if attacked, they will not be upheld unless it clearly appears that the beneficiary was fully informed in regard to the value of the property and the nature of his interests in it. If there was any misrepresentation or concealment, the sale will not be upheld. *Thweatt* v. *Freeman,* 73 Ark. 575; Ex parte *Lacey,* 6 Vesey, 625, 627; *Coles* v. *Trecothik,* 9 Vesey, 234, 246; 2 Pomeroy, Equity Jur. § 958; 2 Beach, Trustees, § 518.

Tested by these rules, it is clear that this purchase by Cornish of the interests of these minors in the estate of which he was the administrator cannot stand; for, by making through his attorney the same misrepresentations to the guardian of these wards that he made to the adult heirs of J. A. Johns, and to which we have referred, he induced her to sell and convey the interests of her five wards in the estate of Joseph Johns to himself for $65 each, which sum was about one-fourth the value of such interests. She afterwards sold to him these shares for that price. As he was administrator at the time he purchased, the sale must be set aside entirely, or he must be required to make good to them the full value of the property purchased.

The interest of each of these minors is a one-fortieth share in the estate, some of which consists of lands. Their interest in this land has been conveyed under the orders of the probate court,

above noticed, and, on account of the small interest which they hold in this land, we think that it will be.to the interest of all parties to allow these sales to stand, and to permit the defendant to settle with them by paying in cash such sum as may seem under the evidence to be equitably due from him to them. After considering the evidence, it has seemed to us that the value of the interests of these minor heirs in the estate of Joseph Johns did not at the time of the sale to Cornish exceed $250 or $275 cash. If that sum had been paid to them, defendant would have made little, if any, profit, and there would have been no ground to impeach the sale. He has paid them $65 cash, and we are of the opinion that, upon the payment of $200 for each of these minors to their guardian and $85 to each of the adult heirs of J. A. Johns, with interest from date of sale, his title to so much of the assets of the estate as came to his hands should be quieted. As to Mrs. Johns, the widow of Joseph Johns, we find no equity in the complaint. The judgment of the chancery court will be reversed, and the cause remanded, with an order to enter a decree in compliance with this opinion.