GALLOWAY *v.* RUSS.

## Opinion delivered December 5, 1927.

1. SALES—FRAUD IN PROCURING CONTRACT.—Where a buyer signed a contract for the purchase of a refrigerating machine under a mistaken impression that the agent represented a different company, and was selling him a different machine from that which he actually purchased, the buyer was entitled to have the sales contract set aside for fraud of the sellers' agent, who, though aware of the buyer's mistake, failed to explain the true situation.

2. EVIDENCE—HEARSAY TESTIMONY.—Statement of a witness as to what a person told him is hearsay, and will not be considered in determining whether such person's testimony is contradicted.

3. CONTRACTS—EFFECT OF FRAUD AND MISTAKE.—Where there has been a mistake of one party as to a matter of fact accompanied by fraud or inequitable conduct of others knowing of such mistake, the contract may be reformed or canceled to conform to the intention of the parties, or may be rescinded *in toto*, where there has been no meeting of the minds.

4. CONTRACTS—SIGNATURE OBTAINED BY FRAUD.—The rule that one who signs a contract after opportunity to examine it, cannot be heard to say that he did not know what it contained, does not apply where the signature of a party was obtained through fraud, trickery, or inequitable conduct upon the part of the other party to the contract.

5. SALES—FRAUD IN PROCURING CONTRACT.—Where the agent for the sale of a refrigerating machine knew that the prospective buyer was under a mistake of fact as to what machine he was selling, but failed to inform the buyer of his mistake before he signed the contract, the buyer was not precluded from subsequently denying knowledge of its contents, though he had opportunity to examine the contract.

6. SALES—RESCISSION—TENDER OF CONDITION PRECEDENT.—Where a buyer of a refrigerating machine notified the sellers that they did not accept the machine, and the sellers informed them that they thought they could hold them under the contract, the buyers were not required to tender a return of the machine as a condition precedent to maintaining an action under the sales contract.

7. CANCELLATION OF INSTRUMENT—NECESSITY OF TENDER.—Where it is evident that a tender will not be accepted, no tender need be made as condition precedent to cancellation.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Carmichael & Hendricks,* for appellant.

*Owens & Ehrman,* for appellee.

WOOD, J.    This is an action by J. T. Russ and C. L. Russ, under the name of Russ Market, against David Galloway, Jr., and Walter E. Woodward, trading under the firm name of Galloway & Woodward Company, to cancel a certain contract.   The plaintiff set up the contract, alleged that it was obtained through fraud and misrepresentation, and alleged that he had paid the sum of $63 on the contract.   He prayed that the contract be canceled and that he have judgment for the amount which he had paid thereon.   The defendants admitted the contract, but denied that it was obtained through fraudulent misrepresentation, and denied all the other material allegations of the complaint.   They set up, by way of cross-complaint, the contract, and prayed that they have judgment for the balance due thereunder, and that the same be declared a lien upon the Lipman machine, and, if the judgment be not paid, that the same be sold to satisfy the judgment.

The testimony of C. L. Russ is substantially as follows :   C. L. Russ and J. T. Russ operate a meat market in the city of Little Rock.   C. L. Russ is a silent partner in the firm, and was also secretary of a retail grocers' and butchers' association.  This association maintained an office, where C. L. Russ stayed and put in his time looking after the affairs of the association, which association paid him a salary.   This office was separate and distinct from his business, which was carried on at a different place by his brother, J. T. Russ. A Frigidaire electrical refrigerating machine was installed in the office of the witness for the purpose of demonstrating, by the W. P. Galloway Company, of Little Rock, Arkansas, which company was the distributing agent of the Frigidaire Company for this territory.   The Russ Market had decided to install at its place of business a Frigidaire machine.   C. L. Russ called the Galloway Company, and requested it to send its representative to his office.   A couple of days thereafter Marshall Purvis and David Galloway, Jr., came to his office.   Purvis had formerly been the representative of the W. P. Galloway Company as salesman of the Frigi-

daire machine. He it was that arranged with C. L. Russ
for the installation of the Frigidaire machine in Russ'
office. Purvis, it appears, had left the W. P. Galloway
Company, and was engaged in selling Lipman refrigerat-
ing machines for the Galloway & Woodward Company.
C. L. Russ had not been informed that Purvis had quit the
employ of the W. P. Galloway Company. When Purvis
and David Galloway, Jr., came to his office they informed
C. L. Russ that his brother, J. T. Russ, had refused to
buy a refrigerating machine unless he, C. L. Russ, signed
the contract. C. L. Russ, previous to that time, had been
trying to persuade his brother to put in a refrigerating
machine, so, when Purvis and David Galloway, Jr., who
he supposed were representing the Frigidaire people,
informed him that his brother was willing to buy if he
would sign the contract, he replied, ''Why, you bet your
life, I will sign it.'' He took them over to the machine
which had been installed at his office for demonstration
purposes, and showed them points that he had found in it
which he did not know before. They were ready to sign
the contract, and asked C. L. Russ to sign, and he told
them that he preferred for his brother to sign, and they
replied, ''He will not do so unless you sign it.'' There-
upon C. L. Russ signed the contract, and told them that
he preferred for the Russ Market to give the check
because he, C. L. Russ, was the silent partner, but he
stated that he would give the check if his brother was
not at the market. He signed the contract, and they went
down to the Russ Market for the check, and, while one
of them was down there waiting for the check, Marshall
Purvis came back and said to C. L. Russ, ''Now, listen:
you were under the impression you were buying a Frigi-
daire, weren't you?'' and Russ said, ''You bet I was.''
Purvis said, ''I am representing the Lipman Company.''
C. L. Russ replied, in substance, that he didn't want the
Lipman at all, and he and Purvis and David Galloway,
Jr., began to argue about the comparative merits of the
Lipman and the Frigidaire, C. L. Russ insisting that he
preferred the Frigidaire and Purvis and Galloway insist-

ing that he take the Lipman. He finally told them he
would wait and see if the Frigidaire was satisfactory,
and, if not, he would take the Lipman. Purvis said,
"They have got a Frigidaire on demonstration in the
office here—we will put one on demonstration in your
brother's place in the store down there." After further
conversation as to the respective merits of the two
machines and the prices thereof, C. L. Russ finally con-
sented that the Lipman Company put one in at the
market, saying, "You can put it in for demonstration, but
it is the understanding that I am not going to buy it."
At that time Russ had signed the contract, but had not
signed the notes, and informed them that he was not
going to sign the notes and that he would not purchase
the Lipman unless it was a better machine at the same
price. A few days thereafter Mr. W. P. Galloway went
to C. L. Russ' office and said to him, "Russ, I under-
stand you thought you were buying a Frigidaire?" and
Russ said, "I sure did." Mr. Galloway said, "I regret
that; I do not appreciate any salesman of ours attempt-
ing to get business that way," and further said, "We are
going to discharge him for that." C. L. Russ replied,
"I hate to have that happen, but that's his business; he
knew that I thought I was buying a Frigidaire." C. L.
Russ made no deal with anybody except Purvis. He went
down to the Galloway & Woodward Company and looked
at a Lipman machine. They told him all about it. He
told them that somebody was an awful liar about the
Lipman, and the only way to show was by demonstration.
When the Lipman machine came, they sent C. L. Russ the
freight bill, and he refused to pay it. They wanted him
to furnish the plumber, but he refused to do that, on the
theory that it was not his duty to furnish a plumber when
they were putting in the machine for demonstration, when
the Frigidaire Company had put in its machine for demon-
stration without any expense. Russ concludes his testi-
mony on examination in chief by saying there was not to
be any sale until after thirty days and the machine
proved to be just what witness wanted, then they would

make the sale. Witness thought Purvis was the Frigidaire man, because he came to witness' office and arranged for the demonstration of the Frigidaire there. On cross-examination the witness stated that the first signature on the contract was his and the other was his brother's. Witness did not look at any part of the contract, nor read it when he signed it. There was no effort made to keep him from reading it, but witness was in a hurry to go down and get the check before his brother left the market. The only way witness was misled about the contract was that he thought he was dealing with a Frigidaire man. The notes were not to be signed until after the machine was demonstrated, and Purvis stated that witness was under no obligation until he signed the notes, and that he would not have to sign the notes until the machine had run thirty days. Witness then told him he could put the machine in on demonstration. The machine was put down at the market, but had never been installed. Witness had no interest in the sale of the Frigidaire machine. When the Galloway & Woodward Company told witness they expected him to pay for the installation of the Lipman, he decided that it was a fraud all the way through, and refused to do so.

The testimony of J. T. Russ substantially corroborated the testimony of C. L. Russ.

David Galloway, Jr., testified that he was the Galloway & Woodward Company. The contract was turned in by his representative, Purvis. It was accepted by the witness, and forwarded to the company he represented. When the Lipman machine came, witness paid the freight on the shipment. The contract was never canceled by the plaintiffs. After the machine had been delivered, Russ called witness over the 'phone and said he wanted to cancel the contract. The morning C. L. Russ signed the contract he was in witness' office, laughing over the whole thing as if it were a joke. He said he didn't know what the Frigidaire people would say, as he kept one of their machines on display in his office, and thought they would get mad. Witness stated that neither of the plaintiffs

said anything to witness about putting a machine on display. The amount due under the contract was $630, and the plaintiffs had paid $63. Purvis was witness' salesman on commission. All contracts he entered into for the sale of the Lipman machine were subject to witness' approval. Purvis was not discharged from witness' employ, but left about two weeks after this machine arrived. Witness knew of no agreement that Purvis had with the plaintiffs to cancel the contract. The contract was not binding until it was approved by the witness. Purvis had no authority to cancel the contract, and said nothing to witness about it. Witness did not tell Russ that Purvis' authority was limited by the contract. Witness paid Purvis $70.50, his commission on the sale. Witness talked with Russ at his office some time after the contract had been made—probably two or three weeks afterwards. Russ complained that Purvis had led him to believe he was buying a Frigidaire. Witness told Russ that witness did not approve of that, and did not believe in misrepresenting anything.

Woodward testified that the first he knew of the transaction was when Purvis brought the order into the office. The next day C. L. Russ came to the office and talked with Terry and the Galloways. About two days later he came back, and said he wished to cancel the order because a lot of things had been told him that were not true. Witness and Mr. Galloway, Sr., went to see C. L. Russ, and Galloway said he wanted to talk with C. L. Russ' brother also, but C. L. Russ replied, "That is not necessary." In this conversation he said he thought he had bought a Frigidaire, and that Purvis had misrepresented things to him, but he made the statement also that he was glad he had bought a Lipman. Witness then told Russ that they would put in the machine on thirty days' trial, and, if it did not do what they said it would, they would take it back and give him his money back. Russ seemed very well pleased, and shook hands with them, and they left. Witness testified that, after the machine came and was delivered at the Russ Market, they asked J. T.

Russ about the location. A controversy then arose about the plumbers' work for installation. The contract provided that the plaintiffs would pay for the plumbing. They did not agree to put the machine in on demonstration, but the agreement was to go on through with the contract and to refund the money if the machine did not make good.

Terry testified, in substance, that he was employed by the defendants as refrigerating engineer. C. L. Russ came to his desk one morning, wanting to know something about the construction and cost of operating a Lipman machine. Witness explained to him the relative merits of the Lipman and the Frigidaire, and Russ went away apparently satisfied, and said nothing about canceling the contract. After the machine was delivered at the Russ Market he selected the place for the installation of the machine, but a controversy arose about the cost of installing same, and Russ said he would call witness next morning, but did not do so.

David Galloway, Jr., recalled, further testified that he went with Purvis to C. L. Russ' office to sell him a Lipman machine. Witness noticed that he had a Frigidaire in there. Purvis showed witness some adjustments on the Frigidaire. Russ did not sign the contract while they were there. After they left, witness remarked to Purvis that Russ had the impression that he (Purvis) was representing the Frigidaire, and witness told Purvis that he should not make a contract under such conditions. Witness waited in the car, and Purvis went back in and talked with Russ. When Purvis came back to the car he said that he had explained to Russ that he was not buying a Frigidaire. When they afterwards went to the Russ Market, Purvis told Mr. J. T. Russ that his brother thought he was buying a Frigidaire, and, when he found out he was not, he said, "Oh, my God, what will W. P. Galloway Company say?" J. T. Russ took it in a laughing way, went in, signed the contract, and gave a check for $63. The contract was then turned in and accepted and mailed back to Russ. It was three or four days after the contract was signed that witness wrote Russ, sending

him a copy of the contract. Witness never heard anything about the machine being put in for demonstration, but witness' firm did guarantee them. Witness stated that he was not present when the contract was signed, but had the impression that C. L. Russ thought at first that witness and Purvis were representing the Frigidaire.

C. L. Russ testified, in rebuttal, that he did not sign the contract after it was explained that they were selling Lipmans instead of Frigidaires. The contract was complete when brought to witness, except for his signature. They told witness, after that, that they were selling Lipmans. They decided to put in the Lipman machine on demonstration, and witness was asked to pay for the installation, which he declined to do. Witness did not remember whether he received a copy of the original contract or not. He did not pay any attention to it after he had canceled it and they had agreed to put in the Lipman on demonstration. It did not make any difference to witness how they handled it. After they had refused to pay for the installation, witness told them they could not put it in at all. Witness had not, at that time, given any order for the Frigidaire, but did afterwards buy a Frigidaire, which the Frigidaire people agreed to put in on a turn-key job, just as they had already stated.

J. T. Russ, on being recalled, denied that he had promised to have the plumbing done for the installation of the Lipman. He stated that he asked their engineer who would put it in, and he said that they did not do it. Then he told the engineer that he would call him the next morning.

The contract was in evidence. We deem it unnecessary to set it forth in detail. It is a contract signed by Russ Market, purchaser, by C. L. Russ, J. T. Russ, and by M. Purvis as salesman, with the notation, "Contract accepted," signed by Galloway & Woodward Company, by ............................................ By the terms of the contract the defendants proposed to furnish the Russ Market, at Little Rock, Arkansas, f. o. b. Beloit, Wisconsin, a Lipman refrigerating machine. The machine was to be

installed by the seller, and the water and electrical connections were to be installed by the purchaser. The contract contained certain guaranties on the part of the seller and certain promises on the part of the purchaser. The contract was not to be valid or binding on either party until accepted by the seller. The contract specified the terms upon which the payments were to be made, and, in much detail, set forth the agreements of the respective parties for the sale and purchase of the Lipman machine.

The trial court made a general finding in favor of the plaintiff against the defendants, and rendered a decree canceling the contract and for the plaintiffs in the sum of $63, from which is this appeal.

1. We have set forth above the substance of the testimony, and it appears that the negotiations resulting in the written contract, which the appellee by this action seeks to cancel, were conducted on the part of the appellant by its agent, M. Purvis, whose name is signed to the contract as salesman. The testimony of Purvis is not in the record, and no explanation of his failure to testify is given by appellant.

C. L. Russ, who first signed the contract for the appellees, testified unequivocally that, when he signed the contract, he thought Purvis was the agent of the Frigidaire, and he thought that he was purchasing a Frigidaire machine. He explained why he thought Purvis represented the Frigidaire people by saying that he had been representing that company, and on Saturday he called the Frigidaire Company and told it to send its representative to see him, that he was ready to buy, and, on Monday thereafter, Purvis and another man came to see him, and represented that they had seen his brother, who had refused to buy a machine unless he (C. L. Russ) would sign the contract. He had been trying to persuade his brother to buy a refrigerating machine, and therefore, when the salesman called on him and gave him this information, they talked over the Frigidaire machine in his presence, and induced him to sign the contract by stating that his brother would not sign it unless he signed it. He

further stated that he did not know at the time he signed the contract that Purvis was no longer representing the Frigidaire Company.

David Galloway, Jr., who went with Purvis to see C. L. Russ, testified that he was present when they were discussing refrigerating machines. He does not testify that he or Purvis represented to C. L. Russ that they were attempting to sell him a Lipman instead of a Frigidaire. He corroborates Russ' testimony to the effect that Purvis showed Russ certain adjustments on the Frigidaire which had been installed in Russ' office; and, while David Galloway, Jr., testified that Russ did not sign the contract while the three of them were talking about refrigerating machines, nevertheless he states that, after they had left, he (Galloway) remarked to Purvis that Russ had the impression that Purvis was representing the Frigidaire, and that he should not make a contract under such conditions; that Purvis thereupon went back and talked with Russ, and returned with the contract, and stated that he had explained to Russ that he was not buying a Frigidaire. But this statement as to what Purvis told him when he returned to the car was mere hearsay, and leaves the testimony of C. L. Russ undisputed that, when he signed the contract, he thought he was purchasing a Frigidaire machine and that Purvis was representing that company.

The testimony of David Galloway, Jr., corroborates the testimony of C. L. Russ to the effect that, while witness and Russ and Purvis were talking about the purchase of a refrigerating machine, C. L. Russ was left under the impression that Purvis was representing the Frigidaire Company, and not the Lipman Company. He was not present when Purvis went back, as he says, to correct that impression, and therefore he could not know whether Purvis did correct that impression or not. Therefore, according to the only competent testimony on this issue, it must be taken as proved that, at the time C. L. Russ signed the contract under review, he was under the impression that Purvis represented the Frigi-

daire Company and was selling him a Frigidaire machine, and that Purvis and David Galloway, Jr., knew that C. L. Russ was under that impression. Although C. L. Russ was one of the appellees, his testimony explaining why he did not read the contract before signing same is perfectly reasonable and consistent. He had a Frigidaire on demonstration in his office, was familiar with it, and wished to purchase same, and thought he was doing so, as Purvis had been representing the Frigidaire Company, and did not inform him that he was no longer representing that company, but, on the contrary, left him under the impression that he was still representing the Frigidaire Company. The explanation of why he did not read the contract under the circumstances is clear, convincing and decisive.

The case, under the facts, comes squarely within the doctrine announced by the authorities generally, and by our own court, that, where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties to a contract, the same may be reformed or canceled to conform to the intention of the parties, where there is an agreement; or rescinded or canceled *in toto* where there has been no meeting of the minds. See *Welch* v. *Welch*, 132 Ark. 227, 234, 200 S. W. 139, and cases there cited. The rule is well expressed by Mr. Black, in his work on Rescission and Cancellation, vol. 1, page 366, § 130, as follows:

"Where one of the parties to a contract is laboring under a material mistake as to a matter of fact, and the other party is aware of the mistake, and seeks to take advantage of it, knowing that the enforcement of the contract as made will result in an unwarrantable advantage to himself, with corresponding loss to the other party, his conduct is so unconscionable as to justify the interference of a court of equity to rescind the contract or prevent its enforcement." See cases cited in note; also *C. H. Younger & Co.* v. *Springer,* 113 Minn. 382, 129 N. W. 773, syl. No. 2.

In 13 C. J., at page 374, §§ 257, 258, it is said: "If a mistake on the part of one of the parties to. an agreement is caused by the other, it may entitle him to avoid the contract. One is not permitted to accept a promise which he knows that the other party understands in a different sense from that in which he understands it. In such a case there is no agreement." See cases cited in note.

Learned counsel for appellants invoke the doctrine which has always been, and still is, adhered to by this court, that one who signs a contract, after opportunity to examine it, cannot be heard to say that he did not know what it contained. See *Colonial & U. S. Mortgage Co.* v. *Jeter,* 71 Ark. 185, 71 S. W. 945; *Mitchell Mfg. Co.* v. *Kempner,* 84 Ark. 349, 105 S. W. 880; *Stone* v. *Special School Dist.,* 119 Ark. 553, 178 S. W. 399; 6 R. C. L. 624. But in these cases there was no circumstance tending to show that the signature of one of the parties to the contract was procured through fraud, or trickery, or inequitable conduct upon the part of the other party to the contract. These cases are clearly differentiated from the case at bar by the facts, because here there were circumstances of fraud, trickery, or inequitable conduct on the part of one of the parties to the contract which caused the other party to sign the same under a mistake of fact, without reading the contract. Purvis and David Galloway, Jr., both knew that C. L. Russ thought that he was negotiating with them for the purchase of a Frigidaire machine. Under the circumstances it was incumbent on them to tell him, before he signed the contract, that he was mistaken. Candor and fair dealing demanded this much at their hands. Here the testimony of C. L. Russ convincingly proves that there was inequitable conduct on the part of Purvis, which amounted to fraud, if the appellants are allowed to reap the benefits of the written contract. Russ' testimony clearly shows circumstances which excuse his failure to read the contract before signing it. Therefore the contract must fall. The trial court did not err in so holding.

2. The above issue involves the *crux* of this lawsuit. It was not necessary for the appellees to tender to the appellants the Lipman machine as a condition precedent to their right to maintain this action. The appellees were asserting no right or title to that machine under the written contract; they contended, and the preponderance of the evidence showed, that they made no claim whatever to the Lipman machine. C. L. Russ and J. T. Russ contend that the Lipman machine was delivered at the Russ Market, not under the written contract, but under an oral agreement, to be installed for the purpose of demonstration, and that the appellants were to pay for the installation, which the appellants refused to do, and that the appellees thereupon notified the appellants that they would not accept the Lipman machine, and were informed by appellants that they thought they could hold the appellees under the written contract. Under these circumstances the appellees were not required to tender to appellants the Lipman machine before the appellees could maintain their action for rescission and cancellation of the written contract. A tender is not required where it is evident that it will not be accepted. *Dickinson* v. *Atkins*, 132 Ark. 84-94, 200 S. W. 817, and cases there cited. See also Black on Rescission and Cancellation, vol. 2, § 625.

3. The trial court, under its general finding, must have found against the appellants on the issues of fact upon which they bottom their contention that appellees have waived their right to cancellation, and are estopped by their conduct from maintaining the action.

After a careful consideration of the record we cannot say that the finding of the trial court on these issues is clearly against the preponderance of the evidence. The decree of the trial court is therefore correct, and it is affirmed.