THOMAS NEWTON BELEW ET UX *v.* MADIE GRIFFIS

5-5331                                    460 S. W. 2d 80

Opinion delivered December 7, 1970

*F. C. Crow,* for appellants.

*John L. Wilson,* for appellee.

GEORGE ROSE SMITH, Justice. In 1956 the appellants, Thomas Newton Belew and his wife, sold a small,

poorly constructed dwelling house to the appellee, Madie Griffis, for a recited consideration of $5,250.00, which the chancellor found to represent both the principal and the interest at 8% per annum. Mrs. Griffis made a down payment of $35.00 and executed a promissory note for the balance of $5,215.00, payable in monthly installments of $35.00 each. Mrs. Griffis also received a warranty deed in which the grantors recited the contractual terms and retained a vendor's lien to secure the unpaid purchase price.

Mrs. Griffis faithfully made the monthly payments for 12 years and 8 months, those 152 payments totaling $5,220.00, or $105.00 more than the original debt. Mrs. Griffis then discontinued her payments, in the belief that the note had been fully paid. Some five months after the Belews received the last of the 152 payments they brought this suit to enforce the note and vendor's lien. It is their contention that the face amount of the note, $5,215.00, represented only the principal of the debt, which bore interest at 8%. In that view Mrs. Griffis had managed to reduce the principal debt by only $61.73 in the course of 12 years and 8 months. The complaint accordingly sought judgment for a balance of $5,153.27 and foreclosure of the vendor's lien.

In answer to the complaint Mrs. Griffis pleaded fraud, in that the sellers had led her to believe that the sum of $5,250.00 was the total amount due, upon the payment of which "her home would be free and clear to her." After a trial the chancellor sustained Mrs. Griffis's position and entered a decree canceling the vendor's lien and dismissing the complaint. For reversal the Belews contend that the decree is contrary to the evidence and that the chancellor erred in admitting certain testimony.

At the outset we recognize the rule that where, as here, a charge of fraud involves the contradiction of a written instrument by oral testimony, the party asserting such fraud must prove his case by clear and convincing testimony. *Clay* v. *Brand,* 236 Ark. 236, 365 S. W. 2d

256 (1963). After studying the record we have no doubt that the appellee fully sustained her heavy burden of proof.

At the time of the trial Belew was 92 years old; his wife was 85. Both testified, with clarity. Mrs. Belew said that she had typed out the note and deed, following forms that had been prepared by an attorney in an earlier transaction. Both Mr. and Mrs. Belew denied having told Mrs. Griffis that the face amount of the note included both principal and interest. Significantly, however, neither Mr. Belew nor Mrs. Belew indicated in any way whatever by their testimony that their understanding of the transaction had been explained to Mrs. Griffis when the documents were signed. Hence the Belews' case rests almost entirely upon the bare language of the note and warranty deed.

Mrs. Griffis testified that when the instruments were signed Mr. Belew pointed to the figure $5,250.00 and said, "This is how much you will pay. I want you to understand your interest is figured in. When you get this amount paid, your house will be paid. It will take you around twelve years to pay for it; then you and the boys [Mrs. Griffis was then a widow with four sons] will have your home." Mrs. Griffis also stated that she did not read the note before signing it; "I didn't think there was any need. I thought everybody should be honest like myself, and I just had a feeling he was just an honest old man."

Counsel for the Belews objected to Mrs. Griffis's testimony, as being in violation of the parol evidence rule. Where fraud is alleged, however, such testimony is competent. Although a person is ordinarily bound to know the contents of a contract which he signs, we have often recognized an exception to that principle when fraud or inequitable conduct is charged. As we said in *Massachusetts Mut. Life Ins. Co.* v. *Brun,* 187 Ark. 790, 62 S. W. 2d 961 (1933): "There is a well-recognized exception to the rule that a party is bound to know the contents of a paper which he signs; and that is where

one party procures another to sign a writing by fraudulently representing that it contains the stipulation agreed upon, when, in fact, it does not, and where the party signing relies on the faith of these representations, and is thereby induced to omit the reading of the writing which he signs. It is well settled that a written contract which one party induced another to execute by false representations as to its contents is not enforceable, and the party so defrauded is not precluded from contesting the validity of the contract by the fact that he failed to read it before attaching his signature." Other cases to the same effect include *Dodson* v. *Abercrombie,* 212 Ark. 918, 208 S. W. 2d 433 (1948); *Galloway* v. *Russ,* 175 Ark. 659, 300 S. W. 390 (1927); and *J. I. Case Threshing Machine Co.* v. *Southwestern Veneer Co.,* 135 Ark. 607, 205 S. W. 978 (1918).

Ordinarily, it is true, the Belews' statement that the recited consideration included both principal and interest would not be admitted to contradict the contract, but we have noted an exception to that rule: "[W]hen one who has had superior means of information professes a knowledge of the law, and thereby obtains an unconscionable advantage of another, who is ignorant, and has not been in a situation to become informed, the injured party is entitled to relief as well as if the misrepresentation had been concerning matters of fact." *Cornish* v. *Johns,* 74 Ark. 231, 85 S. W. 764 (1905).

Here there is no doubt either that the Belews were in a superior position to know the legal effect of the contract, which they prepared, or that they obtained an unconscionable advantage over Mrs. Griffis. Those two points must be examined with care.

First, the Belews were in a superior position to know the legal effect of the note and deed. Not only had they prepared the instruments in the light of at least one previous transaction of the same kind, but also the instruments themselves were by no means readily understandable to a person not skilled in the

interpretation of legal language. Neither the note nor the deed sets out the number of payments that would be required if the recited consideration comprises the principal only. In fact, the deed, which is the only document of which Mrs. Griffis received a copy, contains this extremely ambiguous provision: "Interest payable monthly, and principle and interest payable in monthly installments of Thirty-five Dollars ($35.00) each, the first installment to be paid on or before July 6, 1956, and all other installments to be paid on or before the 6th day of each month thereafter until said note and all interest thereon shall have been paid in full." It will be seen that the foregoing sentence can easily be taken to mean that the $5,215.00 total includes both principal and interest.

Secondly, the contract, literally construed, is perhaps more unconscionable than any other agreement considered by this court in the past hundred years or more. The original recited consideration was $5,250.00. At 8% the annual interest comes to $420.00, which is exactly $35.00 a month. Hence, had there been no down payment Mrs. Griffis might have paid $35.00 a month forever without reducing the principal debt by a penny.

There was, however, a down payment of $35.00, reducing the original debt to $5,215.00. Counsel for the plaintiffs attached to the complaint a computation showing that after Mrs. Griffis had made payments for more than twelve years she still owed $5,153.27. After the case was submitted to us we had an independent computation made which confirms the accuracy of the plaintiffs' figures. (According to our computation the debt would have been $5,153.37—a difference of only ten cents.)

When the same computation is carried forward until the debt is finally paid, it is found that 62 years and 9 months would be required to retire the note: a total of 753 monthly payments. Mrs. Griffis was 41 years old when she bought the house, with a life expectancy of 30 years. Ark. Stat. Ann. § 50-705 (Supp. 1969). At the expiration of those 30 years her 360 month-

ly payments would have reduced the principal by $361.63, leaving a balance of $4,863.37. If, however, Mrs. Griffis lived to be a hundred years old she would have the satisfaction of knowing that the obligation was down to $1,343.39, which would be completely paid in a little less than four more years.

As we have said, the note itself did not state the number of payments needed to retire the obligation if the note were considered to embody the principal debt only. That computation requires 753 monthly calculations, involving many hours of labor. It goes without saying that Mrs. Griffis could not possibly have had any idea of such an appalling future when she signed the note. In fact, we really do not believe that the Belews themselves ever made any such computation, for we are convinced by the proof that they intended for the note to include the interest and that they truthfully so stated when the transaction was entered into.

There are many circumstances pointing to that conclusion. To begin with, it is not reasonable to suppose that Mrs. Griffis obligated herself in a matter of such gravity without making any inquiry about the expected duration of her monthly payments. We know to a moral certainty that she was not told that the payments would continue for more than sixty years. Consequently the only reasonable alternative is to accept as true her testimony that the Belews represented the sum of $5,250.00 to be the entire consideration, principal and interest. No third possibility is suggested by the proof.

Next, according to the only evidence about the value of the house, $5,250.00 would have been an excessive price for the property. Dorsey McRae, an expert in real property values, testified without contradiction that in 1956 the house and lot were worth about $3,340.00. Our computation shows that if the original debt had been $3,305.00 (McRae's estimate less the down payment) and the monthly payments had been $35.00, applied first to accrued interest and then to the principal, the debt would

have been retired in 149 months. That is *exactly* the number of monthly payments that were due under the contract as it was represented to be. Hence it is clear that the parties entered into an equitable contract, based upon the property's fair market value, rather than into an agreement so unconscionable as to have no parallel in our Reports.

Finally, the Belews are shown to have sold two other houses in the same neighborhood with similar notes and lien-retaining deeds. Those deeds are in evidence and are drawn in the same way as that received by Mrs. Griffis. One of the deeds was to Louise Jones and recited a consideration of $5,000.00, payable in monthly installments of $35.00, with interest at 8% annually. At that rate it would have taken Mrs. Jones 38 years and 2 months to pay off the debt, but she testified that the Belews told her that the $5,000 figure included both interest and principal. The other purchasers, Mr. and Mrs. McKamie, both testified that they had been told the same thing by the Belews with respect to a $4,000.00 purchase that would have taken 18 years and 1 month for retirement under the appellants' theory.

The testimony of Mrs. Jones and of the McKamis was objected to, but proof of such similar transactions is admissible to show the parties' intentions. We stated the rule in *Myers* v. *Martin,* 168 Ark. 1028, 272 S. W. 856 (1925): "The general rule is that testimony must be confined to the particular transaction under investigation, and that evidence of other conduct, statements or transactions is inadmissible. There are, however, exceptions to this rule, and they have been recognized in decisions of this court, both civil and criminal. [Citing cases.] Those exceptions relate to proof of motive and design or intention. Decisions of other courts cited in brief of counsel are to the same effect." In a later case, *Schwarzlose* v. *Kingrey,* 231 Ark. 537, 330 S. W. 2d 947 (1960), we upheld the admissibility of testimony about negotiations for similar contracts as tending to prove the terms of the contract actually in issue.

In sum, the record abounds with established facts supporting the appellee's contentions and the chancellor's decree. In fact, except for the naked language of the note and lien-retaining deed, there is hardly any persuasive evidence to the contrary. We have not the slightest hesitancy in holding that the appellee's proof satisfies the requirement that it be clear and convincing.

Affirmed.

Brown, J., not participating.

Jones and Byrd, JJ., dissent.

J. Fred Jones, Justice, dissenting. I do not agree with the majority opinion in this case. Mr. and Mrs. Belew, who were 92 and 85 years of age respectively at the time of trial, owned some lots in what is known as "Belew Addition" to the City of Hope, Arkansas. Mr. and Mrs. Belew had houses constructed on some of the lots and sold some of the houses so constructed. Mrs. Belew prepared the deeds and notes in connection with the sales and in doing so she followed the forms of similar instruments previously prepared by an attorney.

On June 6, 1956, Mrs. Griffis purchased a house and lot from the Belews, the purchase price being $5,250. Mrs. Griffis paid $35 cash on the purchase price and signed a note for the balance. The note bore interest at the rate of eight per cent per annum and was payable in equal monthly payments of $35. The Belews executed and delivered to Mrs. Griffis a warranty deed transferring the title in the property to Mrs. Griffis and a lien was retained in the deed to secure the payment of the note. Mrs. Griffis made the monthly payments on the note until December, 1968, at which time she had paid a total of $5,315 and quit making payments on the note.

The note and deed were in standard form and their terms are unambiguous, so the chancellor's decree

was obviously based on fraudulent representations made by Mr. Belew to Mrs. Griffis which induced her to purchase the property and sign the note. It is my opinion that Mrs. Griffis did not rely on the representations she says Mr. Belew made to her, and it is my opinion that the chancellor's decree is against the preponderance of the evidence in the record before us.

The pertinent part of the deed reads as follows:

"KNOW ALL MEN BY THESE PRESENTS:
THAT WE, T. N. Belew and Kelpa D. Belew, his wife, for and in consideration of the sum of Five Thousand, Two Hundred and Fifty Dollars ($5,-250.00), paid and to be paid by Madie Griffis as follows: $35.00 cash in hand paid, the receipt of which is hereby acknowledged, and the balance of $5,215.00 being evidenced by one promissory note of even date herewith bearing interest at the rate of 8% per annum from date until paid.

Interest payable monthly, and principal and interest payable in monthly installments of Thirty-five Dollars ($35.00) each, the first installment to be paid on or before July 6, 1956, and all other installments to be paid on or before the 6th day of each month thereafter until said monthly installments and all other amounts paid on this note shall be applied first to the payment of the monthly interest and the balance shall be applied on principal. And default in the payment of any installments of principal or interest shall mature said note at the option of the holder. And Grantee agrees to pay all taxes assessed against said property and to keep buildings on property insured in some old line reserve insurance company for not less than the indebtedness.

do hereby grant, bargain, sell and convey unto the said Madie Griffis and unto her heirs and assigns forever, the following lands lying in Hempstead County, Arkansas. . ."

The note signed by Mrs. Griffis is as follows:

"$5,215.00                                   June 6, 1956

In monthly installments, at the times hereinafter mentioned I promise to pay to the order of T. N. Belew and Kelpa D. Belew Five Thousand Two Hundred and Fifteen Dollars ($5,215.00) for value received, negotiable and payable without defalcation or discount, at Hope, Arkansas, with interest from this date until paid at the rate of eight per cent per annum, interest payable monthly; and all signers and endorsers of this note waive demand and protest and notice of nonpayment and agree that the maturity thereof may be extended from time to time without notice to them.

This note shall be paid in monthly installments of Thirty-five dollars each. The first installment on this note to be paid on or before July 6, 1956, and all other installments to be paid on or before the 6th day of each month thereafter until said note and all interest thereon shall have been paid in full, and said monthly and all other amounts paid on this note shall be applied first to the payment of the monthly interest and the balance shall be applied on principal.

All or any part of this note, in addition to said monthly installments, with accrued interest, may be paid at any time prior to maturity, and default in the payment of any installment of interest or principal shall mature note at the option of the holder.

This note is given for balance purchase money for the following lots.

Lot 21 and the North 40 feet of Lot 22, Lot 28 and the North 40 feet of Lot 27 in Belew Addition to Hope, Arkansas, and is secured by vendor's lien retained in deed of even date herewith.

Grantee agrees to pay all taxes assessed against said

property and to keep buildings on said property insured in some old line insurance company for not less than the unpaid balance on this note."

It is, of course, obvious that the principal amount of the note would never be paid in a normal lifetime, if paid in monthly payments of $35 and the payments included both principal and interest as provided in the note. It is clear, however, that the entire amount of the note, or any part of it, could be paid without penalty at any time, and from the preponderance of the evidence, it appears to me that Mrs. Griffis was well aware of that fact. Mrs. Griffis seems to recognize that interest was being paid, but she now contends that she was led to believe that the interest payments were included in the sale price of $5,250, rather than in the monthly payments. There is no evidence of what the sale price would have been without interest under Mrs. Griffis' contention.

Mr. and Mrs. Belew testified concerning the execution of the deed and note and the delinquency in payments. They were unable to remember some of the less important specific details concerning the transaction. For example, Mr. Belew could not remember whether he saw Mrs. Griffis sign the note. Mrs. Griffis testified that she dealt with Mr. Belew in the purchase of the property and that the house was under construction when she purchased it. Mrs. Griffis identified the deed and testified that Mr. Belew gave it to her when it was executed. She then testified on direct examination as follows:

"Q. Now, what did he tell you with reference to the payments and the price he was charging you?

A. Well, he had it doubled like this. He pointed to this $5,250.00, and he said, 'This is how much you will pay,' and he said, 'I want you to understand your interest is figured in when you get this amount paid—your house will be paid.

It will take you around twelve years to pay for it then you and the boys will have your home.'

\* \* \*

Q. What did you do with the deed?

A. I kept it, and finally I went and had it recorded when I knew I was going to stay and finish paying for my home.

Q. Did you read the deed?

A. Yes, sir, but this part of it I didn't understand."

On cross-examination Mrs. Griffis testified that she was fifty-four years of age at the time of trial; that she had finished the 10th grade in school and could read and write. She then testified as follows:

"Q. Now, you say you considered it and when you decided that you were going to really stay you took the deed and had it recorded?

A. Yes, sir.

Q. You mean for awhile you just considered yourself paying rent? You mean you didn't mean to abide by the contract you signed?

A. Yes, sir, I did, but I was told I couldn't.

Q. Who told you that?

A. The neighbors around me, that I'd never pay for it.

Q. So you held it debating whether to stay or whether you considered it rent and abandon the contract, and then you decided not to abandon the contract and you decided you'd have it recorded?

A. Yes, sir, I knew I was going to stay, but when I moved there my neighbors told me—

\*    \*    \*

Q. Did you ever read that note?

A. Yes, sir, I looked over it. I didn't have the note. This is what I had.

Q. Did you ever read that?

A. Yes, sir, I read it.

Q. How many times did you ever read it?

A. I looked over it several different times.

\*    \*    \*

Q. Now, you kept that deed from the time it was delivered to you until—then you decided to record it on March 14, 1966. You kept it nearly ten years before you recorded it?

A. Yes, sir, he didn't require me to record it."

The note was dated June 6, 1956, and Mrs. Griffis testified that she was in Mr. Belew's dining room when she signed the note. She testified that she did not read the note because she didn't think there was any need. "I thought everybody should be honest like myself, and I just had a feeling he was just an honest old man." She testified that the deed was dated the same day of the note, but that she didn't receive it until later when Mr. Belew brought it to her after she had moved into the house in July. The deed was acknowledged January 28, 1957, but Mrs. Griffis insisted that it was delivered to her in July, just a few days after she moved into the house.

Mrs. McKamie, a sister-in-law to Mrs. Griffis, testified that about ten years previously she was visiting Mrs. Griffis when Mr. Belew came by. She says that the three of them got to discussing house payments and when she remarked that she was paying $35 per month house pay-

ments, Mr. Belew remarked, "well, that's the way Mrs. Griffis is paying for her's, $35.00 a month, and when she has paid twelve years it will be completely paid for."

On cross-examination this witness testified that she and her husband bought their place for $1,500 about 22 years ago, and that the monthly payments of $35 included interest in the amount of $3.00 and principal in the amount of $32. She did not remember when her place was finally paid for, but she testified that when her husband got laid off on the railroad, they sold some cows and finished paying for the place.

Mr. Dorsey McRae, a real estate appraiser, testified as an expert for Mrs. Griffis. He testified that the house was in poor repair and the floors were unlevel due to cracking of the foundation. Even so, because of the gradual increase in real estate values, he estimated the fair market value of the house at $4,000 and the value of the lot at $500. Mr. McRae gave an opinion that in 1956 the house had a market value of only $2,840, while the lot was then worth $500. Mr. McRae testified that $35 per month would not be out of line for the rental value of the house, but that if the house could be moved two blocks in any direction it would probably rent for more money.

As I view this case, we have standard unambiguous instruments consisting of a note and lien retaining deed as opposed to testimony of statements made thirteen years previously by a seller who is now 92 years of age, in direct contradiction to the terms set out in the note and deed. The contract, as expressed in the note and deed, may have been a harsh one for the purchaser if she paid the principal and interest at $35 per month and the market and rental value of the property decreased. The contract might have been considered a profitable investment under the provision for prepayment or if the market or rental values increased. In any event, the fair rental value of the property equaled the monthly payments and the $35 per month is only the

minimum amount that may be paid each month toward the satisfaction of the indebtedness. The purchaser in the meantime as owner, could do as she pleased with the property so long as she met the monthly payments of $35. If rental values had gone up, her monthly payments could not have been increased against her will, and if rental values went down, she could have sold the house subject to the purchaser's lien. Mrs. Griffis only paid $35 cash in the purchase of the property and has never paid over $35 per month during the 13 years she has occupied it as *owner*. When the note and deed are viewed in this light, the recited contract is not unconscionable.

From the evidence in the record I am unable to agree with the chancellor that such fraud was practiced by the Belews as would invalidate the terms of the note and deed, or that Mrs. Griffis was induced to enter into the contract she made by fraudulent statements made to her by Mr. Belew. Mrs. Griffis was bound to have known she was to pay interest on her indebtedness. She admits as much, but says that she was told by Mr. Belew that the interest was included in the purchase price. If this be true, Mrs. Griffis, nor her sister-in-law who heard the conversation, nor her brother or Mrs. Jones who purchased property under similar circumstances, ever asked or ever knew what the actual sale price of their properties were. The neighbors told Mrs. Griffis that she wuuld never pay for the property when she purchased it, and she frankly testified that she held the deed from record for ten years until she decided to stay on and keep the property. She strongly intimated on cross-examination that she considered herself as simply paying rent until she decided to keep the property and had her deed recorded.

According to Mrs. Griffis' own testimony, she had purchased the property; had made her down payment of $35; had signed the note for the balance of the purchase price and had moved into the house before the deed was delivered to her. It was upon the delivery of the deed when she says that Mr. Belew pointed to the $5,250 on the deed

and advised her that that was the total amount she would be required to pay.

Mrs. McKamie's corroborating testimony has little probative value. According to Mrs. McKamie's testimony her property would have been paid out for a period of at least eight years even at $35 per month when she says that she engaged Mrs. Griffis and Mr. Belew in conversation as to how she and Mrs. Griffis were paying on their respective notes.

According to Mr. McRae's testimony, the property in its rundown condition has a present market value of $4,500 and a rental value of from $35 to $40 per month. On the basis of the general increase in market values over the years Mr. McRae was of the opinion the house was only worth $2,800 when it was purchased in 1956, but the lot was still worth $500 then as now.

It is my opinion that the chancellor's decree is against the preponderance of the evidence, so I would reverse and remand for further proceedings.

BYRD, J., joins in this dissent.