WILLIAMS *v.* GRAYSON.

5-431                                                      273 S. W. 2d 844

Opinion delivered November 15, 1954.

[Rehearing denied January 10, 1955.]

S. E. Gilliam, Melvin E. Mayfield, C. M. Martin, Silas W. Rogers and E. B. Kimpel, Jr., for appellant.

Keith & Clegg, L. B. Smead and Gaughan, McClellan & Laney, for appellee.

GRIFFIN SMITH, Chief Justice. The appeal is from the chancellor's dismissal of an action to have a deed, regular in form, declared a mortgage. Valuable oil deposits were developed about ten years after delivery of the deed, the worth of which far exceeds surface ownership of the 40-acre fee.

Over a period of approximately twenty years P. C. Grayson had been making small loans to Littleton Williams. In June, 1931, Williams and his wife secured a balance of $915 they owed Grayson by executing a deed of trust covering the forty acres in question. Between that period and 1938 there were payments upon the one hand and miscellaneous advances upon the other, with notes, renewals, trust deeds and mortgages as security. It is appellants' contention that their obligations had been discharged by June 19th, 1948, when Grayson and his wife conveyed the property by deed, but wrongfully retained certain mineral interests.

Conversely, appellee insists that key transactions occurred in December, 1938, and in January following. On

the 17th of December the balance contended for by Grayson was $490. His testimony is that the debtor discharged this obligation by delivering a deed to the property. The instrument was signed and acknowledged by Lugenia Williams, the grantor's wife. She could not read or write, but made her mark. The deed was recorded three days after its execution. According to the deed acknowledgments of husband and wife were before Clyde Whaley, cashier of The Bank of Stephens, in Ouachita county where the land was. Emphasis is placed upon the acknowledgments by Whaley because of the contention that he acted as agent for Grayson and made promissory representations to appellants. For example, Williams testified that shortly before the deed was executed Whaley came to him and urged that it be signed "so Mr. Grayson could hold it until I paid him." Whaley died in 1946.

January 20, 1939, the Graysons—husband and wife—entered into a Contract of Sale and Rent by the terms of which two notes for $224.25 each were recited, and presumptively delivered. Grayson's agreement was that if the notes should be promptly paid (Nov. 1, 1939, and Nov. 1, 1940) the property would be reconveyed to Williams; but subject, however, to reservation in the grantor of all oil, gas, and other minerals. Clyde Whaley as notary public acknowledged execution of the contract, signed copy of which was given to Williams. Although the December deed was promptly recorded, and Williams' copy of the January contract was delivered to him, he disclaimed any knowledge of the mineral reservations. The contract copy, said Williams, was placed in a sack at his home and remained unexamined for almost a decade while miscellaneous payments were being made on the debt, and while other acts affecting the property were being consummated.

June 19th, 1948, Grayson and his wife, by deed, conveyed the property to Williams, but exercised the right expressed in the contract for resale by retaining title to the minerals.

As early as 1920 oil was produced on the Williams land. On March 18th, 1919, Williams and his wife leased to S. S. Hunter. By mesne conveyances the leasehold was acquired by Arkansas Fuel Oil Company and Ormond Corporation. Prior to June, 1953, there was no contention that the lease had been forfeited because of non-development or through abandonment. In the fall of 1948 Ormond Corporation acquired an oil and gas lease on this property from Grayson, representing a ⅜ths interest.

In the Spring of 1949 explorations east of the town of Stephens penetrated to the so-called Hogg sand. This source of production proved to be substantially more valuable than the oil-bearing stratum tapped in consequence of the Hunter lease. Value of early operations is disclosed by Williams' statement that five wells were drilled on his property. Only three were producing. In explaining the source from which funds were realized for payment of obligations to Grayson prior to 1939, Williams testified that he received $68 monthly "from the oil companies." Some of this, he said, was used for purposes not relating to the Grayson transaction.

Following action of Ormond Corporation in acquiring a lease interest from Grayson, Arkansas Fuel and Ormond drilled to the deeper Hogg sand. Operations on two wells began during the early months of 1949. Each cost more than $30,000, and from each oil in paying quantities is being taken.

Although these drilling operations were sustained for a substantial period of time within sight of Williams' home, and the object must have been known to him, he remained quiescent. The explanation is that he thought the operations were under the Hunter lease. In June, 1949, Williams filed suit in which cancellation of the 1938 deed was asked, the alternative being that it should be declared a mortgage. This action was non-suited June 2d, 1950. Eleven months later (May, 1951) the complaint dismissed by the chancellor in the proceedings resulting in this appeal was filed. As one of the defenses laches

was pleaded. We have concluded that the plea should be sustained.

Although sharp differences of opinion are reflected by the testimony and it can be argued with conviction that Grayson did not in his original negotiations intend to cancel Williams' debt and take the land, much of the support for this position rests upon what it is alleged Clyde Whaley said and did in 1938. That he was Grayson's agent in procuring the deed is asserted, but what he said and did are matters left to the construction and veracity of witnesses who claim to have remembered words and actions dimmed by the lapse of almost fifteen years, and relating to transactions that were not, at the time, looked upon as paramount in importance. The 1938 deed from the Graysons to Williams was witnessed by R. L. Elliott (referred to in appellees' brief as Luther), who, according to a statement in respect to unobtainable witnesses, is also dead.

W. O. White, executive vice-president of Ormond Corporation, testified that he purchased for his company the rights Grayson retained in the Williams property, paying $625 for the undivided three-eighths. Before making the purchase White obtained from Watts Abstract Company a certificate showing that Williams owned the surface rights only. White then personally inspected the premises, talked with Williams, and called his attention to the fact that he was not credited with any minerals. Williams replied that he did not claim any. However, White did not procure an abstract of the property or have the title examined. Aside from the Watts certificate he knew of the Hunter lease. In regard to his conversation with Williams, White testified: "I showed him on the certificate where he owned the surface only, and I remember asking him definitely whether he owned any minerals under the property. He said he didn't own any minerals and that he did not know where 'these' people lived. If he had given me any indication of owning any minerals or claiming any, I would have bought a lease from him."

Ellard Anders, tax assessor for Ouachita county in 1949 and 1950, made an effort to identify all property upon which there was oil and gas production. When Williams' deed to Grayson was recorded Anders' attention was called to the fact that [the Hogg sand, presumptively] was producing. His testimony, as abstracted by appellants, was: "When the deed came into our office to transfer the land to Littleton Williams, I asked him if the minerals were assessed in his name, and he said, 'No, that belongs to Mr. Grayson,' and I wrote on the deed that they were reserved." Grayson was with Williams when this conversation occurred.

Much of the testimony on behalf of Williams came from relatives or interested persons. Standing alone it would be quite sufficient to sustain a decree that the 1938 deed was intended as a mortgage. But even among the appellants' witnesses there were contradictions and inconsistencies. An example is the conflict between Jeremiah Thomas Brown (who was Williams' son-in-law and a Missionary Baptist preacher) and J. M. Passwater. Passwater had been engaged in the oil and leasing business for thirty years. He went with Clyde Whaley to Brown's home in December, 1938. Whaley is quoted as having told Littleton and Lugenia Williams that he had brought a deed from Grayson and wanted them to sign it. Lugenia replied that she wasn't going to sign it; she hadn't signed the mortgage. Whaley told the two that Grayson didn't want the land and that he would give them all the time they wanted for payment, whereupon Lugenia replied, "Mr. Whaley, I am going to rely upon what you tell me about it and I will sign it under these circumstances, [but] I can't sign my name, and you will have to sign it for me." On cross-examination Passwater said: "I heard Jeremiah Brown testify that when we went out to his house that I took the lead in the discussion, but I didn't do that. I merely listened and had nothing to do with the transaction whatever."

Brown's testimony was: "I think Mr. Passwater did the first talking about the deed. They both did some talking about it, trying to get Lugenia to sign it. I think

Mr. Passwater took the lead in it.'' Passwater also testified that the morning following their visit to Brown's home he (Passwater) went by the bank, and that Whaley told him it wouldn't be necessary to acknowledge the deed. This service had been performed by Elliott. Grayson testified that Elliott was not asked by him to witness the signature. He told of a conversation wherein Passwater said that he and Whaley went to Williams' home to get the deed signed, ''but 'Lit.' wasn't there.''

The deposition of a psychiatrist who examined Littleton and Lugenia Williams is to the effect that their mentality was that of a seven to twelve-year-old child. In appraising this testimony the chancellor commented upon the range and manner of the direct and cross-examination of appellants. His observations were that ''They didn't manifest that low mentality on the witness stand. . . . It is apparent from their manner and demeanor and testimony here that they were capable of understanding what they were doing.'' This judicial conviction is underscored by Littleton Williams' testimony regarding the source and application of certain funds, copied in the footnote.[1]

For reversal appellants argue their primary proposition—that the 1938 deed was a mortgage; (2) the Sale and Rent Contract was void for want of consideration and because of fraud in its procurement [if] Grayson had no title to the property; (3) the deed from Grayson to Williams was void as to that part reserving the minerals; (4) the trial court incorrectly appraised the evidence.

Since the contentions center around the mineral reservations, with want of consideration for the contract, effectiveness of the 1938 deed, and actions of the par-

---

[1] The question related to a period shortly before Williams paid Grayson $223.30. The witness replied: "I didn't have that much money [the first time I saw Grayson about the payment], but I got it by working, saving, and selling some cows. I had eighty or ninety dollars that day, and to get the rest of the money some month or two later. I sold five hogs to a man from Nevada county and got $48 for one of them. I sold two hogs for $13 apiece to Mr. Green, and two for $10 apiece to Arthur Todd and his daughter. My wife sold $13 worth of chickens, and I sold a cow for $44, and I saved the rest of the money."

ties in dealings among themselves, there is no point in determining whether the contract was supported by consideration when appellants are barred by laches. It is not inappropriate, however, to say that under the contract (not signed by Lugenia) only Littleton Williams was bound by his promise to pay the two notes, or the installments of $224.25; but rental privileges were extended under an agreement that $40 per year would be reasonable.

Affirmed.

Justices MILLWEE, GEORGE ROSE SMITH and ROBINSON dissent. Justice WARD concurs.

## OPINION ON REHEARING.

GRIFFIN SMITH, Chief Justice. Appellants find no fault with so much of the opinion of November 15th, 1954 as sustains the plea of *laches* by Ormond Corporation and Arkansas Fuel Oil Company—developers of the Hogg sand. It is urged, however that facts are not sufficient to sustain *laches* as to Williams and his wife.

The record discloses that in December, 1938, Williams and his wife executed the deed to Grayson. What occurred at the time the deed was delivered and in connection with its procurement are matters in respect of which appellants introduced considerable evidence; yet Whaley, the notary public who took the acknowledgment, is dead, and R. L. Elliott, who witnessed the transaction, has also passed away. The date of Elliott's death is not shown, but Whaley died in 1946. Thus years intervened between the death of this witness and facts regarding which he was informed when the suit was filed in 1948, and to which he could have testified if timely action had been taken. Certainly Grayson was deprived of an opportunity to present the facts known to Whaley and Elliott.

As we have heretofore shown, the deed from appellants to Grayson was dated 1938. The Grayson-Williams contract was executed in January, 1939. This

contract was also acknowledged by Whaley and it contained the same reservation expressed in the 1948 deed from Grayson to Williams. It follows that since 1939 Williams had in his possession an available source to which he could have turned for information regarding the mineral reservation. It was not until two years after Whaley's death that we advanced the contention that the deed was a mortgage and that inclusion of mineral reservations in the 1948 deed was fraudulent. Elliott and Whaley were key witnesses, and their removal by death constituted a substantial change—all to the disadvantage of Grayson if they would have testified to the facts he indicated.

In *Sanders* v. *Flenniken*, 180 Ark. 303, 21 S. W. 2d 847, we pointed out that *laches* was unnecessary delay coupled with some unusual change that occurs in the conditions dealt with and relationship of the parties: "The disadvantage," says the opinion, "may come about from loss of evidence, change of title, intervention of equities, and other causes; but when the court sees negligence on the one side and injury therefrom on the other, it is a ground for denial of relief."

In the same opinion it was said that the right to interpose a plea of *laches* is peculiarly applicable to cases involving oil and mineral lands subject to wide fluctuations in value. Such a situation has intervened in the case at bar.

Rehearing denied.