## John S. SELIG, Arkansas Securities Commissioner v. Gladys T. POWELL, Guardian of Louise POWELL MOONAN

5-6077                                         489 S.W. 2d 484

Opinion delivered December 11, 1972

[Supplemental Opinion on Denial of Rehearing delivered January 29, 1973.]

*Davidson, Plastiras & Horne, Ltd.,* for appellant.

*Rose, Barron, Nash, Williamson, Carroll & Clay,* by: *Phillip Carroll* and *Sam Gibson,* for appellee.

Carleton Harris, Chief Justice. The Securities Commissioner of the State of Arkansas instituted an action

in the Pulaski County Chancery Court on September 16, 1970, alleging that the commissioner had ordered the revocation of the Brookmire Corporation registration (hereafter called BMC or Brookmire) as investment advisor on grounds that such order was in the public interest and that Brookmire was insolvent. The commissioner prayed that Brookmire be enjoined from disposing of its assets until such time as provisions had been made for the protection of public stockholders and creditors and that a receiver be appointed for the purpose of preserving such assets. The court issued its order restraining the disposition of any assets and appointed the commissioner as receiver. On November 24, 1970, Louise Powell Wilson Moonan intervened asserting that she had, on January 28, 1963, executed and delivered to Joseph A. Madey, his heirs and assigns, a warranty deed to certain improved property located at 1429 West 7th Street, Little Rock, receiving three installment promissory notes, each in the amount of $20,000, and each being payable together with interest at 4% in fifteen annual installments beginning January 28, 1964. One of these notes was signed by James W. Moonan, one by Warren T. King, and one by Joseph A. Madey. The intervention asserted that Madey took the title as "a Trustee for Brookmire Management Corporation". Mrs. Wilson married James Moonan on February 3, 1963. Subsequently, Madey and wife conveyed the property to Brookmire. It was alleged that the intervener had never been paid the purchase price of the land and that she had an equitable lien for the unpaid purchase money. In its response, the commissioner pointed out that no lien was retained in the deed nor was there any mention of consideration other than "in consideration of $50.00 with other good and valuable consideration, paid by Joseph Madey, the receipt of which is hereby acknowledged". It was further pleaded that during the entire period of time since the conveyance to Madey and his subsequent conveyance to Brookmire, the petitioner had made no claim against the property and she was now barred from asserting a claim because of laches, waiver, estoppel, and the statute of limitations. Thereafter, on August 4, 1971,

Gladys T. Powell, a sister-in-law of Mrs. Moonan, filed a petition with the court stating that she was appointed guardian of Mrs. Moonan on July 8, 1971, and that the Probate Court of Pulaski County had entered its order authorizing her as guardian to be substituted as party intervenor. The guardian filed an amended petition asserting *inter alia* that for some time prior to the marriage between Moonan and Louise Powell Wilson, and until Moonan's death, he had exercised "a malign influence over intervenor so as to deprive her of her free agency in disposing of her property"; that she had suffered from a constant and steady deterioration of her mental capacities for at least six years prior to the adjudication of incompetency; that Moonan enjoyed a confidential relationship with Louise; and that all parties to the transfer of this property from her to Brookmire "except intervenor herself were officers and directors of that corporation" and accordingly had actual knowledge of all circumstances surrounding the transfer "especially that fraud, duress and undue influence were exercised" and that no payment of the purchase money was made. The commissioner replied denying those allegations and filed a counterclaim alleging that on August 21, 1970, at a time when BMC was insolvent and known by its management to be insolvent, James W. Moonan, a director, President and Chief Managing Officer of BMC, executed a check to Louise Powell Moonan, dated August 21, 1970, and drawn on the account of BMC in the amount of $5,000, purportedly in payment of a note from BMC to the said Louise Powell Moonan. On the same date, the said James W. Moonan executed a check to the said Louise Powell Moonan dated August 21, 1970, in the amount of $833.22, purporting to be interest due on said note; said payment to Louise Powell Moonan constituted an illegal preference to the said Louise Powell Moonan and a fraud upon all other creditors of BMC.

Judgment was sought against the intervenor in the amount of $5,833.22. The case proceeded to trial and a number of witnesses were heard. After the submission of briefs, the court rendered its decree, finding that Mrs. Moonan at all times had a valid equitable lien against

the property and that the balance of the purchase price exceeded the $41,422.53 held in a separate fund in accordance with orders appointing a receiver. It was further found that the commissioner was entitled to judgment against the guardian in the sum of $5,833.22 representing the payment made by Moonan to his wife on August 21, 1970. From the decree entered in accordance with these findings, appellant brings this appeal and appellee cross-appeals from the finding adverse to her.

For a complete understanding of this case, it is necessary that the factual background be given. This background is accurately given in one of the briefs which we proceed to set out, not including any disputed portion. Moonan, Madey, and King, were officers and directors of American Investment Advisors, Inc., an Arkansas corporation, and Moonan and Madey were the principal shareholders of the Class B voting stock of the corporation. Some sixty (60) public stockholders were the owners of approximately 98,041 shares of Class A non-voting stock, some of which was also owned by Moonan. In January of 1963, American, in business as an investment advisor in the Securities field and the distributor of a market letter known as "Investogram" had just concluded the settlement of a copyright infringement suit against Standard and Poor's Corporation which published through its wholly owned subsidiary, Brookmire Investors Services, Inc., a New York corporation, a market letter also known as "Investogram". In settlement of the case, American Investment received a cash payment and the transfer of the subsidiary corporation Brookmire Investor Services, Inc. Standard and Poor's also gave up any claim it might have had to the use of the name Investogram. American Investment changed its name to Brookmire Management Corporation on May 1, 1963. Standard and Poor's and Brookmire Investor Services, Inc. were nationally known corporations. The name of Brookmire was well known in investment circles throughout the United States.

Moonan met Louise Powell Wilson in late 1959 or early 1960. She was a well-to-do widow interested in in-

vestments and had responded to an ad in the newspaper by Moonan's company. Moonan undertook, for a fee, through American Investment to advise her with respect to her investment portfolio. This business relationship existed during 1960, '61 and '62 and at some point became a social relationship when they began dating during 1961 or '62. By 1963 American Investment needed outside capital as it was not itself generating sufficient income to stay financially solvent. In addition, the settlement with Standard and Poor's had just been consummated which made the use of the Brookmire name available, but which also required substantial funds to exploit. Apparently, Louise Wilson and Moonan began discussing marriage in January, 1963. She and Moonan entered into an agreement whereby she would transfer approximately $90,000 in securities to BMC (American Investment at the time) in exchange for 1800 shares of stock in BMC, i.e., she purchased BMC common stock and paid for it with marketable securities. The shares of BMC were in fact issued to her and she transferred her securities to BMC. The final agreement relative to the stock is contained in Intervenor's Exhibit No. 19 and is dated as of April 22, 1963, stating that it "supersedes the agreement of the 28th of January, 1963 between Louise Powell Wilson, Joseph A. Madey and James W. Moonan, by reason of letter dated April 22, 1963, which letter was signed by Joseph A. Madey." This agreement also states that Moonan and his Sales Agents will "undertake and lend their best efforts to resale, from time to time, all or any part of the said 1800 shares of stock referred to in Paragraph 2 herein within one (1) calendar year from issuance of said shares and at a price of $50.00 per share or higher, or the equivalent price in the event of a stock split-up of Brookmire Management Corporation." This agreement was signed by both James and Louise Moonan on September 3, 1963.

The securities transferred by Mrs. Moonan are not at issue in this litigation; rather, the property at issue is the improved real estate located at 1429 West 7th Street in Little Rock which was conveyed to Brookmire

and used by it as an office building, and which was valued at $60,000. Joseph A. Madey, at that time President of American Advisors Inc., practiced law in Little Rock and was acquainted with Mrs. Moonan, having handled two transactions for her.[1] On January 28, 1963, Madey wrote the following letter:

"Mrs. Louise Powell Wilson
916 Commerce Street
Little Rock, Arkansas

Dear Mrs. Wilson:

This letter is written for the mutual understanding relative to certain lands now owned by you which will be transferred to me for certain stipulated purposes contained herein.

Said property is more specifically described as:

Lot 2, Blk 402, Compton's Subdivision to Lincoln's Addition to Little Rock, and commonly known as 1429 West 7th Street, Little Rock.

Said property is being transferred to me for the purpose to be transferred to American Investment Advisers, Inc., of Little Rock, Arkansas as at such time in the future upon your instruction, for such price or property as acceptable to you, this property being held in trust on your behalf.

If this is our mutual understanding we ascribe our names hereto this 28 day of January, 1963 at Little Rock, Arkansas.

(signed) Joseph A. Madey
Joseph A. Madey

(signed) Louise Powell Wilson
Louise Powell Wilson"

On February 3, Madey and wife attended the wedding of Moonan and Mrs. Wilson which was performed by John Ernest Cook, a North Little Rock druggist who held the office of Justice of the peace. At the time of the marriage, Mr. Moonan was 51 years of age and Mrs. Moonan was 58 years of age. Within the week, Madey went to the hospital with a throat ailment. Subsequently, after being dismissed from the hospital, Madey and wife, in May, 1963, conveyed this property to Brookmire.

---

[1] Madey had handled the sale of the Revilo Hotel to the Arkansas Bar Foundation and also handled an estate amounting to approximately $8,000.

Madey testified that in July of 1963, Moonan went to New York and obtained an office on Wall Street, the purpose being to get out a market letter to capitalize on the continuation of the "Investogram" of Brookmire, it being remembered that Brookmire Investors Services, hereafter called BIS, had beed obtained in the settlement. Madey said that a great deal of money was spent on hiring employees, with which he disagreed, and he decided to leave the company. The witness stated that he resigned on the first of January, 1964. Madey testified that it was his understanding that the conveyance of the property was a marriage settlement and he said that the reason the property was conveyed to him as trustee was, "because if he didn't marry her I was going to give it all back to her, I mean, to put it bluntly, she wanted to make sure she was going to get married to the man". The witness testified that he executed the note at the behest of Moonan; that he had never made any payment, and there had never been any demand for payment.

Warren T. King was President of W. T. King & Co.[2] and had very little connection with Mrs. Moonan though he stated that she came to the office with reference to various transactions that had to be accomplished in connection with her transferring property over to the company. He signed a $20,000 note at the direction of Moonan and he also attended a party which she and Moonan gave at their apartment in the latter part of 1964. He said this was at a time when it appeared that the companies might accomplish some degree of success from a financial standpoint. King stated that one payment was made on the property which was written on the King Company account and he said that subsequently, when they became short of funds, and needed money to meet the payroll, Moonan suggested that it might be feasible to sell treasury bonds in customers' accounts using the proceeds of the bonds to meet the payroll, and delivering the

[2]The W. T. King Company was organized as a broker-dealer to sell to the public shares in BMC and BIS. The King Company also obtained leads from BMC and BIS to buy and sell other stocks and bonds for the general public as a broker. In 1963 it had purchased for its customers U. S. Treasury Bonds which it held in its customers' accounts.

bonds later.[3] From that time on, Moonan obtained money from King and placed it in the Brookmire Company. Of course, the losses were never replaced and when it became apparent that these fraudulent acts would become known, Moonan committed suicide and King was subsequently convicted and sent to the penitentiary.

The evidence discloses that Mrs. Moonan did not reveal to her friends or relatives her marriage for quite some period of time. Glayds Powell, the guardian and sister-in-law of Mrs. Moonan, testified that she did not learn of the marriage until a year or thirteen months after the marriage; that Mrs. Moonan was in her home many times but never mentioned it at all, though the two were in frequent contact following the marriage. In addition, she did not mention that she was dating Moonan. Mrs. Powell said that she observed slight mental lapses on the part of her sister-in-law in 1960 or 1961 occasioned by a couple of luncheon dates. She would go by to get Mrs. Moonan but the latter would not be ready and would comment that she forgot it. This, however, was only occasional; at other times she appeared all right, but in 1964 or 1965 her change was more noticeable. She observed that Mrs. Moonan, who had always been well groomed, seemed to have completely lost interest in her clothes or taking care of her appearance, and that in 1964 and 1965, her sister-in-law didn't seem to desire to see anybody and was rather "withdrawn". Mrs. Powell was only at the Moonan apartment after the marriage one time, a party given by the Moonans.

Mrs. Susie Hinton testified that she worked as a maid for Mrs. Moonan and that after the marriage, her

[3]Some time during 1963 or perhaps early 1964 Moonan was unable to meet the payroll because BMC and BIS were never able to operate profitably. Moonan would furnish the names of investors attracted by BIS's news letter and other advertising to King who would call on them and obtain an order to buy government bonds and other securities. Sometimes the bonds were actually purchased and converted by King and Moonan to their own use. After a while they ceased purchasing such securities and simply stole the money direct. This required secret bank accounts and a separate set of books and records.

employer told her that she was turning her business over to Mr. Moonan who had a good "head for business" and that he was going to manage her money for her. Mrs. Hinton said that Mr. Moonan did not want her to work there, and tried to employ other people in her place; that he called her "bad names". She, however, continued to work. The witness testified that Mrs. Moonan drank quite a bit; she started about 1962 and the drinking became progressively worse as the years went by. She would send Mrs. Hinton several times a week to the liquor store. "I think she got real bad about two or three years ago". This witness also stated that she noticed after the marriage that Mrs. Moonan "couldn't remember too well", though she gave no specific examples.

Edwin Brewer, a resident of Little Rock, testified that he had known Mrs. Moonan for at least twenty years and that the two of them had worked together for a number of years at the museum and on decorating projects for the parade of homes. He learned of her marriage in the summer of 1963, and as they continued to work together, he noticed that she would occassionally become forgetful of appointments. He described Mrs. Moonan as very intelligent and capable and noticed in the latter part of 1964 that she seemed very depressed, a condition that appeared to come on gradually, and he suggested to her husband that she ought to see a doctor but he said that Moonan indicated that he was meddling.

Mrs. Edward Brown of Pine Bluff testified that she and her sister had known Mrs. Moonan since 1919, and that the two of them had often spen the night with her, going to concerts together. On May 30, 1963, Mrs. Brown and her sister were visiting Mrs. Moonan in her apartment and were told at that time that she had been married since February. Mrs. Brown was rather shocked since she had previously been told by Mrs. Moonan that Moonan wanted to handle her business but had stated "There is something about him that I cannot trust". The witness said she never observed any drinking but

that several months after the marriage she did notice a change relative to lapses of memory.

Mrs. Mary Pipkin Johnson testified that she had been acquainted with Mrs. Moonan since 1946 and that her husband, an architect, was employed by Mrs. Moonan as the architect for the building which was constructed on the 7th Street property. She said that she, her husband, and Mrs. Moonan became close fiends and saw each other regularly during the fifties. In 1954, each bought a one-half interest in the old Revilo Hotel, rented it for some time, but finally tore it down because it had become unsafe. The two women were later approached by the Arkansas Bar Association with regard to purchasing the property. She said that the transaction was handled by Mr. Madey, who was brought in by Mrs. Moonan. The property was conveyed to the Arkansas Bar in September, 1962, and Mrs. Johnson testified that there was no doubt in her mind but that Mrs. Moonan knew exactly what she was doing when she sold the property. She said that it must have been about a year before she learned that Mrs. Moonan had married.

Irene Merideth testified that she had known Mrs. Moonan since about 1924, Mrs. Merideth was employed in Europe and was home on leave in 1961 at Christmas, again in 1963, and then came back to Little Rock to live in 1964. She stated that Mrs. Moonan told her at Christmas, 1961, that she had been dating Mr. Moonan, that he was a stock broker, and a most attractive man, and she was contemplating having Mr. Moonan handle her stock transactions. The witness stated that Mrs. Moonan was entirely normal. At Christmas of 1963 she said Mrs. Moonan told her that she had married and she (Mrs. Merideth) noticed a change in her dress and manner. She stated that Mrs. Moonan had always been a well groomed person, and on this particular occasion she was wearing a dress that Mrs. Merideth knew to be at least eight years old and that this was incompatible with her prior habits. The witness also said that Mrs. Moonan had never engaged in drinking except for an occasional cocktail but at this particular time Mrs.

Moonan was doing a great deal of drinking. She testified that a definite change was noticed in 1964 with regard to her physical appearance and dress. Subsequently, her contacts diminished, though it was apparent that Mrs. Moonan was extremely nervous.

Mrs. Max Greenbaum, by deposition, testified that she had known Mrs. Moonan for about thirty years. The two lived in the same apartment building and had traveled together for several years, to New York, Florida, and other places. She said that their relationship was very pleasant until they took a trip together to Florida sometime in 1962. During that trip, there were difficulties, involving an automobile accident, the purchase of a new car by Mrs. Moonan, and a change of mind by the latter over whether to stop at Panama City on the return trip. She said that Mrs. Moonan was not at all cooperative and just didn't act like herself. Mrs. Greenbaum testified that Mr. Moonan later moved right under her apartment, his apartment adjoining Mrs. Moonan's. She said that at that time Mrs. Moonan had been in the apartment for ten or twelve years and she estimated that Moonan rented the apartment in the building in 1962. "I'm really guessing at these particular dates, underneath me, but as far as I knew they had no connections with each other and I was a very close friend. But, oh, about a year after, or a little more than a year, I would say, there was a lot of tearing up going on down there, and I knew something was happening between the walls, carpenters and so on and so forth. So we just decided that they were turning the two apartments into together, but she hadn't ever told me then that they were married. Because, as I say, she had kind of brushed me off completely."

She said that one day in 1964, Mrs. Moonan called her and told her that she wanted to tell her something, and Mrs. Greenbaum said, "It couldn't have anything to do with taking that wall out downstairs could it?" Mrs. Moonan then proceeded to tell her that she was married. Mrs. Greenbaum stated that this occurred at

least a year after the marriage. She said that before she left the apartment building in May of 1967 Mrs. Moonan was "getting very, very bad". She said that the latter was not very clean with her person and that her conduct was peculiar.

The witness testified that she had on occasion heard arguments between Mr. and Mrs. Moonan, the building not being soundproof. She stated:

"I think you very seldom—I said it was not a sound-proof building, so I did definitely hear things. In fact I called them at 4:00 o'clock one morning and asked her what was going on down there, if they were breaking up all the furniture and would they please turn their high-fi down, because his den and my bedroom wall went right straight down and I couldn't go to sleep. She hung up the receiver on me."

She said that this happened on a lot of Saturday nights; that she could not tell what they were talking about but the tone of the voices gave the impression of arguments.

Dr. Mahlon D. Ogden, a practicing physician in Little Rock, whose testimony was offered relative to Mrs. Moonan's mental competence, testified that he first saw Mrs. Moonan in 1969 and that his diagnosis was mild mental deficiency, probably due to arteriosclerosis or early cyanosis. The doctor stated that the first symptom of this disease is a loss of memory and next a deterioration in personal appearance. He said that subsequently the affliction might go into more severe personality disorders and might, depending upon the part of the brain involved, occasion a weakness in the muscles or paralysis of various kinds. He concluded that the malady had begun six to eight years prior to 1970, but this opinion was predicated on evidence from her husband and Susie Hinton; he, of course, had no actual knowledge of her condition during the early period mentioned because he did not know her at that time. The doctor further stated "Sometimes they are rather sudden, but—I just accepted their say so because it

seemed reasonable at the time". It developed that the doctor had signed a Social Security form for Mrs. Moonan, which the government required a physician to execute before receiving Social Security payments. In executing this form, Dr. Ogden stated that Mrs. Moonan had been under his care since May, 1970[4] One of the questions propounded is "In your opinion, is the patient able to manage benefit payments in his (her) own interests?" and the doctor responded "Yes". On the document it is pointed out "(Whether or not he is able to sign his checks is not controlling. He must be able to use them or direct their use for his own well-being)". When asked specifically if he (the doctor) felt that Mrs. Moonan was able to use the funds for her own benefit and well-being at the time the statement was signed, September 28, 1970, the doctor replied "Yes". This concluded the evidence adduced by appellee.

John Ernest Cook, operator of the Argenta Drug Company of North Little Rock, also a Justice of the Peace, testified that he performed the ceremony between James Moonan and Louise Wilson, which was held at Mrs. Wilson's apartment. He described her as a "lovely, vivacious, charming gracious, lady". He said she was well groomed, neat in appearance and seemed "extremely" intelligent.

Mrs. Pearl Newton was employed at the Warehouse Liquor Market, testifying that she had worked there for thirteen years. She said that she had known Mrs. Moonan for about six years, becoming acquainted with the latter by virtue of the fact that she was a customer. She dated her acquaintance as commencing in 1965. She said that Mrs. Moonan was "very nice", talked a lot and would tell her about the trips that she had made. She described her as a lovely person. "Real neat, attractive. Just—she dressed just perfect, you know. Just, well, sweet, intelligent, interesting. Well, just a—just one to talk to, you know, smart, and just—well, we enjoyed her conversations of her trips and she invited us many times to come up there to see her." Subsequent-

---

[4]Mrs. Moonan is presently at Jacksonville Convalescent Home.

ly, Mrs. Newton moved into the same apartment building and lived across the hall from the Moonans, and soon thereafter she noticed that Mrs. Moonan seemed to be going through a personality change, her way of dressing, and she did not want to talk to anybody. She said that Susie was generally with her at all times that she saw her; that Susie would come to the store for purchases rather than Mrs. Moonan; that sometimes she would see Mrs. Moonan on a hot day wearing her coat, and picking up trash in the front yard, and talking to herself. These observations were made about two years before Mr. Moonan's death. After he committed suicide, Mrs. Newton said "she was just—it was a pitiful sight".

At the outset, if the chancellor's decree, wherein he held that Mrs. Moonan at all times had a valid equitable lien against the property, is to be affirmed, it must appear by the preponderance of the evidence that fraud and deceit were practiced on Mrs. Moonan in order to prevail upon her to execute a deed to the property. In *Hunter v. Johnston*, 226 Ark. 792, 294 S.W. 2d 49, this court said:

> "Under this factual situation appellees are not entitled to have a lien impressed on appellants' home in Polk County. There is no evidence that Percy and his wife agreed to give Mrs. Hunter a lien, or that they tricked or defrauded her into making the loan, or that she expected any security for the advancements other than the notes and their promise to repay.
>
> Generally speaking, before equity will create or impress a lien in a situation similar to the one here presented, either it must appear there was some agreement to that effect, or there must be a showing of decit or fraud."

There is no contention here that there was any agreement for a lien which leaves only two issues to be determined.

In deciding whether Mrs. Moonan is entitled to an equitable lien on the real estate here involved, two

questions present themselves, *viz*, did appellee establish that fraud or deceit was practiced upon Mrs. Moonan in obtaining the deed to the real estate, and second, was Mrs. Moonan mentally incompetent at the time of the conveyance? These issues must be considered together, though they will be discussed separately.

As to the first there is absolutely no direct evidence of fraud. While, because of the fact that Moonan and King subsequently defrauded numerous investors[5], one might feel that they also defrauded Mrs. Moonan, there really is no evidence that this was true. It clearly appears from the record that Mrs. Moonan, described at the time of the transaction as a capable, intelligent woman, who, apparently for many years had been interested in, and had purchased stocks and made investments, fell very much in love with Mr. Moonan, and had mentioned his attractiveness to friends. According to Mr. Madey, who had served as her attorney on earlier occasions, Mrs. Moonan urgently desired to marry Mr. Moonan and the purpose in the letter to Madey, heretofore quoted, and signed on the same day as the execution of the deed to Madey, was to protect her in case Moonan backed out of the marriage. In other words, if there was no marriage, the property would be conveyed back to her. A study of the transcript is rather convincing that Mrs. Moonan, because of her interest in stocks and bonds, and her knowledge of the influence of the Brookmire name in investment circles, which would henceforth be operated by her to be husband, was rather exuberant over the opportunity of becoming "Mrs. Brookmire". In accordance with those feelings it would not be surprising that she willingly deeded the real estate here involved to Madey, intending that it be subsequently deeded to BMC if nuptial arrangements were complied with.

One thing is definite; Mrs. Moonan did not want her marriage revealed and none of her friends knew about

[5]The records reflect that the public was defrauded of approximately $1,-200,000 and claims from hundreds of persons have been filed totaling approximately $1,000,000.

it until at least some months later, and some of these learned it entirely by accident. Madey testified that the property was not to be deeded to the company directly because if the corporation had executed the notes, the debt of $60,000 would have had to be carried as an off-set liability on the balance sheet and the prospectus and approval of the planned stock sale by the State Securities Division would not have been as likely.[6] Actually, the circumstances much more indicate that Mrs. Moonan was aware of the significance of the transactions than to the contrary. In March, 1965, the company executed a mortgage to the Union National Bank to secure a loan in the amount of $33,000. There was never any objection from Mrs. Moonan nor was there any objection when the court in 1970 ordered the property sold and a part of the proceeds used to discharge this indebtedness. Appellee says that Mrs. Moonan did not know of the mortgage but there is no proof to substantiate this statement.[7]

Let us look at other circumstances which indicate that Mrs. Moonan acted with her "eyes wide open". One friend of long years standing testified that she was told by Mrs. Moonan, while the latter was dating Mr. Moonan, that "There is something about him that I cannot trust". Yet, not too long afterward, she conveyed the property. Testimony from several friends indicated that as time passed on, she became quite depressed, and also began to drink considerably, facts which indicate worry —could she have been worried over what was happening to her investment? Nor can it be said that Moonan had her "cowed" since one witness testified that she heard them arguing many times.

---

[6]The parties, as indicated by their agreement with reference to the securities and stock of BMC contemplated a public sale of BMC's shares at a price of $50.00 per share (or its equivalent in the event of a stock-split). Of course, in order to obtain approval from the State Securities Division, the corporation had to show a healthy financial condition. The Registration Statement and Prospectus *inter alia* contained a balance sheet showing the ownership of land and building valued at $60,000 with no liability thereon.

[7]Nor is it explained why Mrs. Moonan, if incompetent, filed the intervention herself. This was done in November, 1970, and no guardian was named until July 8, 1971.

Looking at the matter from yet another standpoint, this was not a marriage where a fortune hunting husband, after acquiring his wife's properties, walked off and left her; to the contrary, he lived with her until his death and only a few days before that event, evidently knowing that he intended to take his own life, deposited the sum of $5,833.22 in Mrs. Moonan's account at the bank. The $5,000 was in payment of a corporation note given Mrs. Moonan for a loan of $5,000 and the balance represented interest. This act is not compatible with that of a husband who is just "using" his wife. Actually, the evidence denotes that, at the outset, there was no intention to defraud anyone. The success of American Investment Inc. in acquiring BIS from Standard & Poor's appears to have given all parties a vision of a successful investment business and each expected to make money. There was testimony that BIS as a subsidiary of Standard and Poor's had a net income of over $180,000 a year or two before being taken over by American Investment, later BMC. It was only after the business began to deteriorate that fraud and chicanery were employed. Be that as it may, there simply isn't any proof that matters were misrepresented to Mrs. Moonan and that she executed the deed as a victim of fraud and deception.

Nor is there evidence that she was mentally incompetent at the time of the conveyance. The most that can be said during the early period after the marriage is that she would occasionally forget appointments or events that had happened; subsequently she became lackadaisical and indifferent about her mode of dress. A forgetfulness of minor events is not too uncommon at her age and the lack of interest in her attire is certainly consistent with her depression. Certainly, forgetfulness does not mean that one is incompetent and, at any rate, there is no testimony that Mrs. Moonan was anything other than normal at the time the conveyance was executed. Dr. Ogden's testimony was of no benefit. In the first place, he certified on September 28, 1970, that Mrs. Moonan was able to manage Social Security payments in her own interest. Admittedly, his statement that the malady had

probably begun six to eight years prior to 1970 was based on a history from her husband and Susie Hinton, Dr. Ogden having first met her in 1969. While he said that mental deficiency due to arteriosclerosis or early cyanosis was generally gradual, he also said that it sometimes occurred suddenly. The doctor was asked a specific question whether Mrs. Moonan was able to use the Social Security funds for her own benefit on September 28, 1970, and replied "Yes". Certainly, her condition was close to its worst at that time, and even then, the proof was that she was able to handle her money. Of course the time pertinent to this litigation is 1963.[8] In accordance with the reasoning herein setout, the decree, on direct appeal, is reversed.

Appellee cross-appeals from that portion of the decree which grants to appellant judgment in the sum of $5,833.22, representing the payment heretofore discussed. Admittedly, the payment constituted a preference but, says appellee, the question is whether it was an illegal preference. The statute with reference to the prohibiting of preferences was passed as Act 189 of 1893, and very clearly forbids such. See Ark. Stat. Ann. §§ 64-1104-1105 (Repl. 1966). In 1965 however the General Assembly passed an Act known as the "Arkansas Business Corporation Act" and it is pointed out by appellee that there is no mention of preferences in this Act; that the Act carries a repealing clause providing that all laws and parts of laws in conflict are repealed and it is accordingly contended that the old law prohibiting preferences has been repealed by implication. We do not agree for we find nothing in the 1965 Act which disturbs §§ 64-1104 and 64-1105, the sections relating to preferences. Of course, repeals by implication are not favored in the law, and we have so held numerous times. In *Moncus v. Raines*, 210 Ark. 30, 194 S.W. 2d 1, this court quoted with approval 50 Am. Jur. p. 542 et seq as follows:

---

[8]It will be remembered that she was described at the time of the wedding by the person who performed the ceremony as vivacious, well groomed, and extremely intelligent, and in 1965 she was described by a witness who saw her often as "real neat, intelligent and interesting".

"Repeals by implication are not favored, and there are many instances in which particular statutes are held not to be repealed by implication. As a general rule, the legislature, when it intends to repeal a statute, may be expected to do so in express terms or by the use of words which are equivalent to an express repeal, and an intent to repeal by implication, to be effective, must appear clearly, manifestly, and with cogent force. The implication of a repeal, in order to be operative, must be necessary, or necessarily follow from the language used . . .The courts will not hold to a repeal if they can find reasonable ground to hold the contrary."

On page 548 of the same volume, we find:

"The criterion by which to determine whether there is an implied repeal, is whether or not there is irreconcilable conflict between an earlier and a later statute. . ."

The court did not err in this ruling.

The decree is therefore reversed on direct appeal and the cause remanded with instructions to enter a decree consistent with this opinion. On cross-appeal, the decree is affirmed.

Supplemental Opinion on Denial of Rehearing delivered January 29, 1973

1. EQUITY—LACHES—DEFENSES.—The ignorance of one's rights does not prevent application of the doctrine of laches in a suit brought after unreasonable delay unless such ignorance was due to fraudulent concealment or misrepresentation by the party invoking the doctrine.

2. EQUITY—LACHES—PREJUDICE FROM DELAY.—Equity will not relieve a party where laches operates as an estoppel and the delay becomes inequitable and works a disadvantage to another.

3. EQUITY—LACHES—APPLICATION OF DOCTRINE.—Where appellee failed to establish fraud or mental incompetence, she was guilty of laches and not entitled to enforce an equitable vendor's lien under the evidence.

CARLETON HARRIS, Chief Justice. On petition for rehearing, appellee states that the court, though filing an expansive opinion, makes no mention of what she deems to be the central issue, viz., that she was entitled to a ven-

dor's equitable lien under our cases, it being undisputed that Mrs. Moonan was never paid for the property at issue, and also undisputed that the corporation, which obtained title by deed from Madey, knew that she had not been paid. Several cases are cited in support of this statement, including *Shall* v. *Siscoe*, 18 Ark. 142 (1856), where this court stated:

> "It is very well settled in England, and in most of the States of this Union, that, in equity, the vendor of land has a lien for the purchase money, not only against the vendee himself, and his heirs and other privies in estate, but also against all subsequent purchasers having notice that the purchase money remains unpaid. The lien exists, although there be no special agreement for that purpose, and notwithstanding the vendor conveys the land by deed, and takes the note or bond of the vendee for the purchase money. To the extent of the lien the vendee becomes a trustee for the vendor and his heirs, etc., and all other persons claiming under him, with such notice, are treated as in the same predicament. * * *And third persons, having full knowledge that the estate has been so obtained, ought not to be permitted to keep it, without making such payment, for it attaches to them, also, as a matter of conscience and duty."

On this basis, appellee contends that she is entitled to prevail in this litigation unless one of the defenses asserted by appellant, laches, estoppel, waiver, and limitations, bar her from relief.

While we did not discuss this particular argument by appellee, since it was overshadowed by the argument of fraud on the part of appellant, and mental incompetence on the part of Mrs. Moonan, we find no merit in same, and actually, it cannot be considered without reference to, or discussion of, the other arguments.

We think the record reflects that Mrs. Moonan was guilty of laches. There is no contention but that Mrs. Moonan executed the deed, and signed the letter authorizing the conveyance of the property to Brookmire. In her brief, appellee states that Madey did not discuss terms and conditions with Mrs. Moonan, nor was the latter informed of the omission of the lien retaining clause or the existence of the notes. As to the first, the letter from Mrs. Moonan

to Madey set forth the conditions, and Madey testified that this was simply a matter of Moonan going through with the marriage. As to the second, to say that she was never informed of the omission of the lien retaining clause or the existence of the notes is simply speculation. While Madey testified that he did not so inform her, there is no evidence that Moonan, or others, did not so advise. But at any rate, having unquestionably executed the deed, it was then up to appellee to present evidence that she did not know what she was doing, was overreached, or that fraud was committed to obtain the conveyance. In *Belew* v. *Griffis,* 249 Ark. 589, 460 S.W. 2d 80, this court said:

> "Although a person is ordinarily bound to know the contents of a contract which he signs, we have often recognized an exception to that principle when fraud or inequitable conduct is charged. As we said in *Massachusetts Mut. Life Ins. Co.* v. *Brun,* 187 Ark. 790, 62 S.W. 2d 961 (1933): 'There is a well-recognized exception to the rule that a party is bound to know the contents of a paper which he signs; and that is where one party procures another to sign a writing by fraudulently representing that it contains the stipulation agreed upon when, in fact, it does not, and where the party signing relies on the faith of these representations, and is thereby induced to omit the reading of the writing which he signs. It is well settled that a written contract which one party induced another to execute by false representation as to its contents is not enforceable and the party so defrauded is not precluded from contesting the validity of the contract by the fact that he failed to read it before attaching his signature'."

In the last case cited, this court also stated:

> "In a recent case we said: 'Learned counsel for appellants invoke the doctrine which has always been, and still is, adhered to by this court, that one who signs a contract, after opportunity to examine it, cannot be heard to say that he did not know what it contained'."

In *Bradley Lumber Company of Arkansas* v. *Burbridge,* 213 Ark. 165, 210 S.W. 2d 284, this court pointed out that ignorance of one's rights does not prevent the application of the doctrine of laches in a suit brought after unreasonable

delay, unless such ignorance was due to fraudulent concealment or misrepresentation by the party invoking the doctrine of laches.

We stated in the original opinion that fraud was not established, i.e., that Mrs. Moonan was not induced to execute the deed by false representations as to its contents, and there is absolutely no evidence that Mrs. Moonan did not have the opportunity to examine the deed. In *Sanders* v. *Flenniken*, 180 Ark. 303, 21 S.W. 2d 847, this court, in referring to laches, and mentioning that it operates as a species of estoppel where delay becomes inequitable, stated:

> "The disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes, but, when the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief."

The answer by appellee to the defenses raised by appellant to the claim for lien by Mrs. Moonan is that the latter, because of fraud and mental deficiency, did not know the status of the corporation, and was not in a position to assert any rights. The original opinion points out that the evidence on mental incompetence was not sufficient to sustain that allegation.[1] In other words, in the seven year period from the time of the execution of the deed until the institution of the suit by the Securities Commissioner, Mrs. Moonan should have recognized that something was wrong when she received only one payment from the corporation, and if she was looking to Brookmire for her money, was negligent in not taking steps to ascertain the reasons therefor.[2] During the seven year period mentioned, an action could have been instituted which would have reflected the financial instability of the corporation, and both on that phase, and Mrs. Moonan's claim to the property, revealing evidence could have been offered. Unquestionably the principal witness in such a proceeding would

---

[1] While, in the original opinion, we definitely commented that the evidence reflected Mrs. Moonan to be mentally competent at the time of the conveyance, it is clear from our discussion of this particular point that we considered the evidence to reflect that she was mentally competent at all times during her marriage to Moonan, and we so hold.

[2] King testified that one payment was made by the corporation, and in her brief in support of Petition for Rehearing, appellee states that "$3,999.99, representing the first installments, was paid". This amount totals the annual payment called for under individual notes by Moonan, Madey and King.

have been James Moonan but never, during Moonan's life time, was there any suggestion by Louise Powell Moonan that she had not been paid for her property, and it was only after his death and after Brookmire had gone into receivership that she asserted her claim of lien against the building.

In *Williams* v. *Grayson,* 224 Ark. 207, 273 S.W. 2d 844, the plea of laches was sustained. There, it was contended *inter alia* that the evidence did not support this finding against Williams and wife (the testimony even included an opinion by a psychiatrist that the mentality of both was that of a seven to twelve-year-old, though this was disputed by other evidence). On rehearing, this court sustained its original finding, stating:

> ". . . It is urged, however that facts are not sufficient to sustain *laches* as to Williams and his wife.
>
> The record discloses that in December, 1938, Williams and his wife executed the deed to Grayson. What occurred at the time the deed was delivered and in connection with its procurement are matters in respect of which appellants introduced considerable evidence; yet Whaley, the notary public who took the acknowledgement, is dead, and R. L. Elliott, who witnessed the transaction, has also passed away. The date of Elliott's death is not shown, but Whaley died in 1946. Thus years intervened between the death of this witness and facts regarding which he was informed when the suit was filed in 1948, and to which he could have testified if timely action had been taken."

There, the period of time covered was about ten years but length of time is not controlling where action could have been taken prior to the demise of an important witness, one who might well possess peculiar knowledge of the facts. For instance, in *Page* v. *Woodson,* 211 Ark. 289, 200 S.W. 2d 768, the opinion reflects the following facts:

Earl Page instituted suit in October, 1945 against his wife for divorce. A complete written property settlement between the parties was made a part of the complaint and the decree, and the divorce and confirmation of

property settlement was granted and approved by the court on October 9 of that year. On January 10, 1946, Mr. Page died testate without surviving issue, leaving his property to a sister, Maude Woodson, and others. Less than one week after his death, Mrs. Page instituted suit against the appellees endeavoring to set aside the property settlement on the grounds that she entered into the settlement under duress, her husband threatening to take her life if she contested the divorce or refused to execute the property settlement; that the duress continued to exist until shortly before his death. Subsequently, in February, Mrs. Page instituted another suit, alleging the same grounds, and in addition asserting that she had a meritorious defense to the divorce action which she was prevented from exercising by threats of her husband. The trial court found for appellees, and on appeal, the chancellor's decree was affirmed by this court. After pointing out that Mrs. Page had consulted able counsel as to property rights and was apparently fully advised, the court added:

> ". . . There is still another reason why the appellant cannot prevail in this action, and that is, that she has been estopped by conduct amounting to laches.
>
> It appears certain from the evidence that the duress claimed by appellant grew out of alleged threats of Earl Page to take her life prior to and leading up to the divorce decree and property settlement.
>
> Immediately following the divorce decree, Mr. Page went to Yell County where he remained until December 13th, when he suffered a heart attack. He was in a Little Rock hospital from December 14th to December 24th, and soon after Christmas, he went to Carlsbad, New Mexico, where he remained until his sudden death January 10, 1946.
>
> We find no evidence of any duress or threats subsequent to the property settlement and divorce decree. In these circumstances, Mrs. Page waited more than three months after the decree of divorce, and for approximately a week following Mr. Page's death, and when he could no longer speak for himself, before bringing the present suit."

We mentioned that the law required prompt action on her part and such action had not been taken.

William Sherman, Securities Commissioner at the time of the institution of the suit for receivership, testified that a registration statement was filed with the Commissioner in July, 1963, the purpose of such statement (which reflected the value of the lands and building at $60,000) being to provide information to the Securities Division Office with regard to a pending sale of stock. He stated that if a registration statement complies with the law, and full disclosure is made, the registration is approved. He testified that this was a secondary registration, "which means they were re-registering the outstanding shares of Brookmire common stock, i.e., a registration by the shareholders to qualify their shares for distribution." He said there were approximately 60 shareholders, and after the filing of this statement, the Securities Division gave its approval to offer these shares of stock to the public. This same information was contained in the prospectus which was offered to the public as a matter of information in connection with the stock sale. It would appear from the testimony of the commissioner that it is doubtful that the sale would have been approved had the registration statement reported the true facts. In addition, let it also be remembered that the investors, attracted by the BIS Newsletter and other advertising by BMC, permitted King as a broker to purchase various securities, and it is axiomatic that these people would not have invested their money with a resulting loss in excess of one million dollars without relying upon the purported financial condition of the companies.

Equity, of course, will not enforce a stale demand under the circumstances here mentioned, and accordingly, we are really back to the basic questions, viz., did appellee establish that fraud or deceit was practiced upon Mrs. Moonan in obtaining a deed to the real estate? Was Mrs. Moonan mentally incompetent and thus unable to look after her interests? We have answered both questions in the negative, and under those findings, we hold that Louise Powell Moonan was guilty of laches, and not entitled to enforce any equitable vendor's lien.

574

Petition for rehearing denied.

Byrd, J., would grant the rehearing.